NORTH CHICAGO ST. R. CO. et al. v. CHICAGO UNION TRACTION CO. et al.

WEST CHICAGO ST. R. CO. et al. v. SAME.

(Circuit Court, N. D. Illinois, N. D. December 17, 1906. On Motion for Leave to Amend Bills, January 14, 1907.)

Nos. 27,508, 27,509.

1. ESTOPPEL—CORPORATIONS—RATIFICATION OF CONTRACT.

Two street railroad companies of Chicago leased their properties to a third, or operating, company for a long term of years, for a fixed rental, payable quarterly. The third company also acquired the stock of a fourth company owning other lines by virtue of a contract by which such fourth company issued its bonds which were exchanged for such stock, and which were secured by a mortgage on its property, and also by a pledge of the stock. Subsequently a further agreement was entered into between the lessors and lessee, by which future rentals were made to depend to a certain extent upon the net earnings, and which provided that, in case the net earnings of the leased properties were insufficient to pay a stated rental, the deficiency should be made up from the net earnings of the property of the fourth company after deducting expenses and interest on its bonds. The agreement also provided that the lessee should so vote the stock of such fourth company as to carry out its provisions, and that, in case of default in the payment of rentals, such stock should be forfeited to the lessors. Held, that having so taken the benefit of the transaction by which the lessee became the owner of such stock, the lessors ratified the same, and were estopped to attack its validity or the title of the transferee on the ground that the transfer of the stock was made by one who held it in trust for them in violation of the trust; also that such estoppel precluded them from attacking the validity of the bonds and mortgage of the fourth company, although such right was reserved to them in terms by the amended lease contract, since without ownership of the stock they had no standing to make such attack.

2. SAME.

The president and controlling stockholder of two street railroad companies entered into a contract by which he agreed to sell his stock and to secure for the purchaser long-term leases of the property of the two companies and the control of their boards of directors, which he did, but before the sale was consummated he caused an operating agreement to be

executed between said companies and another, owning connecting lines, of which he owned the stock. On learning of such agreement, the purchaser claimed it to be a breach of the contract, and to settle the dispute he entered into another contract with the purchaser by which he sold it the stock of the third company, receiving as part consideration a release of all claims and demands against him executed by the two lessor companies. Subsequently new boards of directors were elected by such companies in the interest of other stockholders, who entered into further contracts with the lessee by which they ratified and estopped those companies from questioning the validity of the transaction by which such lessee acquired the ownership of the stock of the third company. *Held*, that such ratification and estoppel extended to the release, and precluded the companies or their stockholders from maintaining a suit to recover from the seller the proceeds of the stock so sold, on the ground that he held it as their trustee.

3. EQUITY—PRACTICE—RIGHT TO PLEAD TO AMENDED BILL.

Under the practice in federal courts of equity an amendment of a bill does not entitle a defendant who has answered the original bill to demur, plead, or answer anew to the entire bill, but only to any new matter introduced by the amendment.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, §§ 568, 569.]

4. SAME—AMENDMENT OF BILL.

Under the practice of the federal courts in equity, a defendant cannot require the complainant to amend his bill.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, §§ 552, 553.]

5. REFORMATION OF INSTRUMENTS—MISTAKE—APPROVAL OF CONTRACT BY COURT.

Contracts entered into by the directors of street railroad companies with a third party at a time when the companies were in the hands of receivers affecting rights which were in the receivers cannot be reformed by a court of equity on the ground of mistake at suit of the companies or their stockholders, where such contracts were subsequently ratified and signed by the receivers pursuant to an order of the court, made with full knowledge of the facts, and where the companies accepted benefits and claimed rights thereunder after knowledge of the facts.

6. SAME—RIGHT TO REFORMATION—DEPRIVING CONTRACT OF MUTUALITY.

A contract which is based wholly on the ownership by one of the parties of the stock of a corporation, without which it could not perform the contract on its part, will not be reformed by a court of equity so as to give the other party the right to attack such ownership.

In Equity. Motion to compel complainants to attach exhibit to bills, and right of answering defendants to plead, answer, or demur by reason of joining of John B. Parsons by amendment.

Henry S. Robbins, for complainants.

Clarence A. Knight and Hopkins, Peffers & Hopkins, for defendant bondholders.

Sears, Meagher & Whitney, for Union Traction Co. and its receivers, and Consolidated Traction Co.

Ritscher, Montgomery, Hart & Abbott, for Equitable Trust Co.

SANBORN, District Judge. These ancillary bills are brought by the North Chicago and West Chicago Companies and their stockholders to enforce causes of action belonging to the receivers of said companies, which the receivers decline to prosecute; they being made defendants. The main purpose of the suits is to redress the alleged fraud of the late Charles T. Yerkes, who, as president and managing director

of the North and West Companies, is charged to have built suburban street railways with the funds and upon the credit of said companies, and with taking to himself and certain of his associates nearly all the stock of the corporations created to build the suburban roads, instead of securing it to his cestuis que trust, the North and West Companies. This stock so taken by him was afterwards exchanged for stock in the defendant Chicago Consolidated Traction Company (being a consolidation and successor to seven of the suburban companies), and later exchanged for bonds of the Consolidated Company secured by mortgage. The purpose of the bills is to obtain this Consolidated stock as valid shares, cancel the bonds and mortgage—or, if this is impracticable on account of bona fide holdings, to have the bonds delivered to North and West Companies. Another purpose of the bills is to cancel two operating agreements made between North and West and the Consolidated Companies, alleged to give the latter the valuable right to use the tracks of North and West in the business district of Chicago, and thus injurious to the North and West Companies.

Demurrers to the bills were put in by all the defendants and overruled by Judge Grosscup. All the defendants except John B. Parsons (lately brought in) and Henry G. Foreman filed their answers, and complainants have been taking proofs in support of the bills before a master; their proof being now (December, 1906) nearly complete. The original defendant, Yerkes, claimed the right to plead, but Judge Grosscup required him to answer. Before the time expired he died. The suits were revived against Owsley as executor, who answered, but claimed and was accorded the right to an argument on his right to file a plea or pleas, setting up defect of parties plaintiff, estoppel, release, and laches. The Foreman pleas were filed in proper time, so that his right to file and have a hearing on at least one plea is clear, under U. S. v. California & Oregon Land Co., 148 U. S. 31, 13 Sup. Ct. 458, 37 L. Ed. 354. Parsons likewise, if he decided to enter a general appearance, has the full right to plead, answer, or demur to the bills as amended. Owsley having answered, his right to file a plea is different from that of Foreman and Parsons; but the court may exercise a discretionary power, especially if Parsons and Foreman stand on their clear right to plead, instead of answering, to allow Owsley to plead, and, if any plea tendered by him is deemed valid, to sustain it, permitting the evidence already taken to stand if complainants elect to take issue on such plea.

The Chicago Union Traction Company and its receivers, the Consolidated Company, and the Equitable Trust Company, after having fully answered the bills, after the argument on the Foreman and Owsley pleas, applied for leave to plead also. Later still the defendant bondholders (except Parsons) applied for leave to plead, answer, or demur anew, for the reason that complainants had amended their bills by bringing in Parsons as a bondholder, and putting him in the same position as Owsley, Furbeck, and other bondholders. They insist that any amendment to the bills, however unimportant, gives all the defendants the right to plead as fully as to the original bills, relying on the rule laid down by Daniell and certain federal cases. At the same time the same defendants move to compel complainants to annex to

their bills a certain instrument forming part of an agreement stated in the bills, on the ground that the bills, having stated an agreement, and annexed part of the instruments constituting it, may be compelled to complete the statement of the agreement by attaching the rest. All these questions are now before the court, depending primarily on the record made by the bills, amendments, and proposed pleas, and on certain other facts cited to enable the court to fully understand the situation, in order to be enabled to exercise a proper discretion. Sufficient of the record will be stated to sustain the conclusions reached.

The North and West Companies were organized in 1886 and 1887, and from their organization down to June 30, 1899, controlled and operated a large system of street car lines on the North and West sides in Chicago, having a practical monopoly, by reason of the location of their tracks, of the street car business in such portions of the city. During this period Charles T. Yerkes was president and managing director of both companies, the stockholders reposing such unlimited confidence in his integrity and business ability that he was allowed to exercise practically exclusive control and management of the corporate affairs, the boards of directors taking no part in actual management. Under these circumstances it was the duty of Yerkes to refrain from placing himself in a position where his personal interest would conflict with his duties to the companies, and to abstain from profiting personally at their expense; but, disregarding this duty, said Yerkes in the year 1894 devised a scheme of building and equipping, with the funds and upon the credit of the North and West Companies, electric railways in the territory north and west of that covered by the roads of complainants, and appropriating to his individual use the profits accruing therefrom.

The bills then go on to state the organization of seven suburban street railroad companies, with an aggregate capitalization of $11,000,000. These companies were merged on February 1, 1899, into the defendant, the Chicago Consolidated Traction Company. These seven companies are called the "subsidiary companies." It is alleged that Yerkes caused the roads of these feeders, or subsidiary companies, to be built and equipped with the moneys and upon the credit of the North and West Companies, and then took over to himself, but in the name of another person, all the stock of the subsidiary companies which he and certain associates admitted into the scheme appropriated to their own use and benefit. The theory of the bills is that this stock, having been obtained by Yerkes and associates in a fiduciary capacity as trusted agents of the North and West Companies, in equity vested in the companies by virtue of the fiduciary relations existing, and became the property of the companies as soon as they learned of the situation and decided to affirm the transaction and claim the stock; that Yerkes and associates, having used the funds and credit of the companies to get this stock, and being their agents and fiduciaries, took the stock for the companies and held the legal title thereto in trust for them; and that the companies as soon as they were able to act in an independent manner in their own right, after ascertaining the real facts, asserted their rights and brought these suits to have the stock turned over to them and to have the Consolidated Company bonds, in exchange for

which the stock was given up by Yerkes and associates, canceled, so as to give them the profits of the transactions which Yerkes was able to put through, through his position as trusted agent on the credit and with the money of the North and West Companies, and which transactions Yerkes could not have otherwise successfully prosecuted.

The bills pray, first, that the North and West be decreed to be the owners of all the consolidated railroads, because built with their moneys or credit; but, if this be not granted, then that they be decreed the owners of all the stock of the Consolidated Company, or such part thereof as Yerkes and his associates held when it was exchanged for bonds. They further pray that the Consolidated Company mortgage for $6,750,000 be held void, as a cloud on title, and that all the bonds be held void. An account is also asked against Yerkes in case the bonds and mortgage be not set aside as to bona fide holders for moneys received for stock before the bonds were issued; that he surrender to a receiver to be appointed all bonds still owned by him, pay to the receiver all moneys received by him for the sale or pledge of any of the bonds, and all moneys received by him for said stock; and that the receiver be decreed to pay the moneys and bonds to the North and West in proper proportions; and that a receiver for the Consolidated Company may be appointed. It will be seen that the seven companies which were merged into the Consolidated, and the Consolidated Company itself, are treated in the bills as valid and subsisting corporations, and not as identical with the corporations of the North and West. The stock of the Consolidated is treated as valid, as well as the bonds, in the event that the mortgage cannot be set aside by reason of the bonds or some of them being held by holders for value in due course. It appears from the bills that the Consolidated stock was all "water," nothing being paid for it, and that the Consolidated did not get a dollar for the issue of the bonds, except the considerations of the second operating agreement, Exhibit F. The bills do not ask to have the stock set aside or canceled. Probably the only person who could ask that would be the Consolidated Company. On the contrary, they treat the stock as valid and as having been taken by Yerkes in the capacity of their agent or trustee; just as a principal may affirm an unauthorized transaction and take the benefit of it. The North and West, having no standing to set aside the stock, simply take the position that it is valid so far as they are concerned; that Yerkes took it in their interest as their agent, and held it for them, and they are now asserting their right to it, and to the bonds issued in exchange for it, so far as they are owned by him or his associates. They say, in effect, that if Yerkes, instead of receiving the stock from the suburban companies, had received $1,000,000 from them for the aid given them by his principals, the North and West, the money would be theirs, and he would hold it, and be liable to account for it as their trustee or fiduciary; they merely asserting their right to what is theirs—their own money produced by their outlay and their credit, and not his.

The bills, after stating fully the organization of the subsidiary companies and their merger into the Consolidated Company, state that Mr. Yerkes was a man of very large means and the largest stockholder in the North and West Companies, and about April 1, 1899, he entered

into negotiations with a syndicate of New York and Chicago capitalists with a view of selling out his stock in said companies, and the negotiations resulted in an agreement whereby a new corporation was organized under the laws of Illinois, known as the "Chicago Union Traction Company," which was to purchase the stock of the North and West Companies, and acquire by lease all their property and assets for the purpose of thereafter operating the street railroad systems of the companies.   Leases were accordingly made from the North and West Companies to the Union Company, under which they went into possession for the term of the unexpired charter lives of the lessors and all extensions or renewals thereof.   The rent reserved in the lease from the North Company was $237,600 per quarter year, and in the lease from the West Company $197,835 per quarter year.  · Meanwhile the Consolidated Company continued to be run and operated by Yerkes and his associates, who held its stock, under its own management.

The bills then state that the leases provided that the North and West Companies should maintain their corporate existence during the leasehold term, and to enable them to do so the Union Company should pay the cost thereof, not exceeding $3,000 a year for each company, and that the rentals might be paid in the shape of dividends to the stockholders of the North and West Companies.   The result of these provisions was to make the North and West Companies nonactive or dormant corporations, with no business to transact and no substantial corporate powers to perform, and to save expense the Union Company, with the tacit consent of the North and West Companies, took the task of maintaining such corporate existence, which was done by having the boards of directors resign and electing in place thereof employés of the Union Company, and from July 26, 1899, to July 24, 1903, this system was maintained, so that the North and West Companies during this period were controlled by so-called dummy directors put in by the Union Company.   None of these dummy directors owned any stock in the North or West Companies or had any pecuniary interest in their affairs, or were in any way familiar with its business, and they did not exercise their own judgment upon any question arising affecting said companies, or act under any sense of responsibility to them, but acted wholly as directed by the Union Company.   The Union Company, therefore, occupied a fiduciary relation during said four-year period to the North and West Companies, and thus became disqualified from making or benefiting by any transaction or contract made by it with the North and West Companies through the dummy directors.

The bills further allege that shortly after July 26, 1899, the Union Company learned for the first time that the said Yerkes had after the making of the agreement for the sale of the stock to the promoters of the Union Company, and before the dummy period began, caused the execution by the North and West Companies with the Consolidated Company of an operating agreement, so called, by which the Consolidated Company was given the right to run its cars over the tracks of the North and West Companies into the down town or business district of Chicago, and it then became their duty to take steps to avoid this operating agreement (which it is alleged in another part of the bill

was a fraud upon the North and West Companies). In order to avoid such step, Yerkes and the Consolidated Company, of which he was then president, proposed to the Union Company that, if the Union Company would cause the dummy directors and officers of the North and West Companies to execute to Yerkes a general release of all claims which they might have against him, he would share with the Union Company the profits realized by him from the construction of the subsidiary roads, such division of the profits to be made in the following manner: The Consolidated Company was to issue its mortgage bonds for $6,750,000 at 4½ per cent. interest, secured by mortgage on the Consolidated Company's property, the bonds to be delivered to and guarantied by the Union Company and exchanged at the rate of $450 par value of bonds to $1,000, par value of stock, and that the Consolidated Company's stock when so received should become the property of the Union Company, and should then be by it deposited with the Equitable Trust Company, the trustee in the mortgage, as further security for the bonds. Such proposals were carried out. All the $15,000,000 stock of the Consolidated Company, except 155 shares, was delivered to the Union Company, a very large part thereof by Yerkes as owner. The exchange of bonds for stock was made and the stock delivered to the trust company, and is still in its possession and control under a trust agreement attached to the bills. A second operating agreement was made between the Consolidated Company and the Union Company, attempting to ratify and confirm the first operating agreement, and the Union Company caused the dummy directors of the North and West Companies to pass a resolution ratifying the new operating agreement and authorizing the officers of the companies to execute the Yerkes release.

It is further stated in the bills that prior to September 1, 1903, the North and West Companies had no notice that Yerkes or any of his associate directors had personally profited out of the construction and equipment of any of the subsidiary lines, or any notice of the making of the two operating agreements, or of the fact that said North and West Companies were the real owners of said railroads and their stock, or of the Consolidated Company bonds, or that they were in any way interested in the Consolidated Company, or of the Yerkes release, and that the stockholders of the North and West Companies were not able to obtain until July 26, 1903, the resignations of the dummy directors and officers and the selection of independent boards of directors acting in the real interests of the companies. It is also alleged that in April, 1903, creditors' bills were filed in this court against the North and West Companies and the Union Company; and receivers were appointed over all three companies and their property.

It further appears that propositions were made for a modification of the leases made to the Union Company reducing the rent payable to the North and West Companies or their stockholders by making it depend to a certain extent upon the net earnings of the Union Traction system and, also, as the Union Company had by virtue of the transfer of the $15,000,000 Consolidated Company stock from Yerkes and his associates to the Union Company obtained the virtual control of the Consolidated Company's lines, the earnings of those lines were to go

in as part of the gross earnings upon which the diminished rent payable to the North and West Companies should be determined. Accordingly, and on the 24th of July, 1903, an agreement was entered into between the North and West Companies and the Union Company, which agreement consisted of four written instruments, two amended leases, one being made by the North and the other by the West Company, a "side agreement," so called, and a tripartite agreement, so called, between the North and West and the Union Companies in relation to certain stock of the North and West Companies held by the Union Company, and defining the respective interests of the parties therein.

By the amended leases the rent was made to depend on the gross income of the lines of the North and West and the Consolidated Company, deducting therefrom fixed charges, interest, operation, depreciation, taxes, damages for personal injuries, etc., in order to arrive at the net earnings. If the net earnings are less than $237,600 per quarter for the North Chicago Company and $197,385 per quarter for the West Chicago Company (the rents reserved in the original leases), an amount equal to the difference shall be made good out of the net earnings from all its other railways; that is, from the Consolidated lines. If such net earnings are insufficient to make it good, the actual amount of earnings shall be divided between the North and West in proper proportion. Any deficiency remaining after such division shall not be a charge against the lessee (the Union Company) unless the rent falls below $99,800 per quarter for the West Chicago Company, and below $118,400 for the North Chicago Company. Any deficiency below these amounts is to be a cumulative charge against the future net earnings "of the demised property and of the Traction Company"; that is of the North, West, and Consolidated lines. The Union Company guaranties that its net earnings shall be sufficient to pay these minimum rentals. The gross income is to include fares, tolls, etc., from the demised property, and income of every description from the railways owned, leased, or operated by the Union Company. In order to arrive at the net income, certain deductions of fixed charges, operation, etc., are made, and among these deductions are the following:

"Interest upon the bonds of any company, directly or indirectly controlled by the Traction Company, for which said company may be, or be held to be, liable by reason of any agreement of guaranty, or otherwise [meaning the Yerkes Consolidated bonds].

"Such proportion of any deficiency arising from the operation or control of existing feeders or connecting lines, connected with the railways of the [West Chicago] Railroad Company and the North Chicago Railroad Company, or either of them, as may be agreed upon between said two companies and the Traction Company."

Referring to any deficiency in earnings of the Consolidated lines caused by the payment of 4½ per cent. interest on the $6,750,000 Consolidated bonds, being $303,750 annually.

It will be seen that this instrument makes the amount of rent payable to the North and West Companies depend in part on the earnings of the Consolidated lines, the control of which was given to the Union Company by the transfer of the Yerkes stock growing out of the

agreement of December 1, 1899, when the Union Company guarantied the Consolidated bonds and Yerkes got the Consolidated bonds and the release; also that the North and West, up to this point, recognize the obligation of these bonds by agreeing that the Union Company may deduct from the gross income what they pay for interest on them. In other words, the North and West take the benefit of this contract to pay them rent, but do not propose to take the burden of that part of it which allows the Union Company to hold the Consolidated stock and pay interest on the Consolidated bonds.

Before this point is further considered, however, it is necessary to refer to the instrument referred to in the last clause above quoted, which was the "side agreement" between the North, West, and Union Companies, made the same day, and is as follows:

"Whereas, the said parties of the first and second parts have respectively demised their street railways to the said party of the third part by leases bearing date the 1st day of June, A. D. 1899, which leases have been amended and altered by instruments bearing even date herewith; and,

"Whereas, in the said amendments it is provided that the rentals to be paid shall in part be dependent upon the net earnings of the properties respectively demised to the said Traction Company, and in part be dependent upon the net earnings of the entire system of railways operated by the said Traction Company; and,

"Whereas, the said Traction Company has certain traffic arrangements relative to the lines of street railway owned by the Chicago Consolidated Traction Company, and has control over said Consolidated Traction Company under and by virtue of the provisions of a certain agreement under which the capital stock of the said Consolidated Traction Company is deposited with the Equitable Trust Company, and in pursuance of which the said capital stock is agreed to be voted in accordance with directions received from the President of the Union Traction Company, so long as default shall not be made in the payment of the principal or interest of the bonds of the Consolidated Traction Company, to secure the payment of which said shares of stock are deposited; and

"Whereas, controversies have arisen as to the validity and binding effect of the transactions which resulted in the issue of the said bonds, and as to the obligation to pay the interest accruing thereon; and

"Whereas, in the amendments to the said lease bearing even date herewith it is provided that there shall be deducted from the gross income of the demised property, in order to ascertain the net income thereof 'such proportion of any deficiency arising from the operation or control of existing feeders or connecting lines connected with the railway of the West Chicago Street Railroad Company and the North Chicago Street Railroad Company, or either of them, as may be agreed upon between said two companies and the Traction Company"; and

"Whereas, the lines of the said Chicago Consolidated Traction Company are feeders or connecting lines connected with the railways of the said West and North Chicago Street Railroad Companies, and the parties hereto are desirous of defining the rights of the respective parties hereto with reference to the said lines of the Consolidated Traction Company under the said leases as amended:

"Now, therefore, in consideration of the premises, it is hereby covenanted and agreed as follows:

"First. It is covenanted and agreed that until otherwise agreed in writing between all the parties to these articles of agreement, said Union Traction Company shall continue to control or operate the lines of the Consolidated Traction Company to the same extent as at the date of the execution of these articles of agreement, and shall take all steps and cause all acts to be done and all payments to be made which shall be or become necessary in order to maintain the existing relations between the Union Traction Company and the said Consolidated Traction Company: provided, however, that nothing

herein shall operate or be construed to operate in any way to interfere with the parties hereto, or either of them, questioning the validity of said bonds of said Consolidated Traction Company, or the obligation to pay interest thereon, or of the operating agreement with the said Union Traction Company, or questioning the validity or binding effect of any contract or guaranty of the North or West Chicago Street Railroad Companies made in connection with any of the lines of railway now operated by the Consolidated Traction Company, it being agreed that said controversies and the question involved therein shall be left open, to be hereafter adjusted or litigated.

"Second. It is covenanted and agreed that any deficiency in the income of the Consolidated Traction Company below the amount necessary to discharge its obligations shall be paid out of the gross earnings of the said Traction Company as a part of its operating expenses until otherwise mutually agreed between all the parties hereto, and that all the deficiencies so charged shall constitute an indebtedness due from said Consolidated Traction Company to the said Union Traction Company, to be collected or repaid to said Union Traction Company out of the first surplus net earnings of the said Consolidated Traction Company, and that when any such deficiency shall be collected by the said Union Traction Company the same shall be paid over to the North and West Chicago Street Railroad Companies to the extent that the rent payable to the said Street Railroad Companies shall have been diminished by the charging of said deficiencies as a part of the operating expenses of the said Union Traction Company, and of the said North and West Chicago Street Railroad Companies, as hereinafter provided, except to the extent that such deficiencies of rent shall have been made good to the said Street Railroad Companies out of other funds.

"It is further covenanted and agreed that all payments made by the said Union Traction Company, as above provided, on account of deficiencies in the earnings of the Consolidated Traction Company, shall be charged as a part of the operating expenses of the North and West Chicago Street Railroad Companies respectively, in the proportion of the gross earnings of each to the aggregate of their total gross earnings.

"Third. It is agreed that the Union Traction Company shall cause the stock of the said Consolidated Traction Company to be voted in such a manner as to cause these articles of agreement to be carried into effect, and shall cause all necessary contracts and agreements to be entered into to carry into effect these articles of agreement.

"It is further covenanted and agreed that any interest or right heretofore or hereafter acquired by the Union Traction Company in the stock of the said Consolidated Traction Company, or in any of the companies formerly owning any of its constituent lines, or in any company succeeding to the ownership of any of said lines, shall, during the continuance of said leases, be held and owned for the joint benefit of all the parties to these articles of agreement, for the sole purpose of carrying into effect the provisions of these articles of agreement and of said leases, and that in the event of the forfeiture of said leases by reason of any default of the said Union Traction Company, the same shall be the property of the said North and West Chicago Street Railroad Companies, and shall be owned by them in the proportion which the present outstanding capital stock of each bears to the aggregate of their total outstanding capital stock; and that upon the termination of the said leases by lapse of time or surrender, without default on the part of the Union Traction Company, the same shall belong to the said Union Traction Company, free from any claim thereon on the part of the said North and West Chicago Street Railroad Companies.

"Fourth. This agreement shall be construed as though it were a part of said leases, respectively, of June 1, A. D. 1899, as modified as aforesaid, and any breach of this agreement shall have the same effect as a breach of any of the provisions of said leases, respectively, as so modified.

"Fifth. This agreement shall enure to the benefit of, and shall bind, the successors and assigns of the parties hereto."

This agreement was also executed by the receivers of the three companies, pursuant to an order of court, November 12, 1903.

Another instrument, being a modification of the tripartite agreement, in respect to the stock of the North and West held by the Union Company, was also executed on the same day. These four papers are all parts of the same transaction, and together constitute the "agreement" of July 24, 1903. They are all to be construed together as if expressed in the same instrument. It is now sought by the pleas offered to set up an estoppel on complainants by reason of the execution particularly of the side agreement, which was not referred to or attached as an exhibit to the bills, in connection with the amended leases, making the rentals in part dependent on the earnings of the Consolidated lines, authorizing the deduction of interest on the Yerkes bonds in diminution of rent, and providing for the continuance of existing relations under the operating agreement. The Consolidated Company also pleads acquiescence and estoppel to question the operating agreements.

Upon the preliminary question whether the alleged frauds of Yerkes gave the North and West Companies beneficial ownership of the stock of the constituent companies and the $15,000,000 stock of the Consolidated Company, rather than operating as a fraud on the constituent and consolidated companies, rendering the stock voidable by them, the first view was that evidently held by Judge Grosscup in overruling the demurrers. Of course, if these constituent companies are to be regarded as mere construction companies, and they and the Consolidated Company only as dummies or instruments of the North and West Companies, this view is sound, because Yerkes' alleged fraud on them by causing the issue of the fictitious stock might be regarded as a fraud on the North and West Companies. If, on the other hand, the constituent companies and Consolidated Company, as the bills seem to show, are to be looked upon as independent entities, having their own stockholders, property, and business, it might possibly be in the end decided that the alleged frauds of Yerkes in appropriating to himself all its stock, without consideration to it or its constituent companies, were mainly frauds against it and them, and that North and West Companies are only to be looked upon as creditors, not entitled to the stock, but that the Consolidated Company, if ever in a position to do so, might have the stock and bonds canceled. For illustration, suppose it cost $450,000 to build and equip the road of the Ogden Street Railway Company, one of the constituent companies, under a contract with the State Construction Company (in which Mr. Yerkes owned 70 per cent. of the stock) fixing the contract price at $450,000 in bonds and $2,000,000 cash or stock of the Ogden Company; that the Ogden Company issued the bonds, Mr. Yerkes procured their guaranty by the West Chicago Company, and then the Ogden Company turned all the bonds and stock over to the construction company in full satisfaction of the contract, and Mr. Yerkes thus became possessed of 70 per cent. of the $2,000,000 stock, the other 30 per cent. going to local promoters of the Ogden Company for obtaining the franchise, etc. Suppose, further, that this was simply a scheme to enable Yerkes to control the Ogden Company, and appropriate a majority of its fictitious stock to himself. Assume, further, that the Ogden Company was an independent company, having a street franchise, owning the road, owing the

bonds, etc. On these suppositions was it the Ogden Company which was defrauded, or the West Chicago Company? However, this question was not argued before me, and was disposed of by Judge Grosscup. I have not carefully examined it, and indicate no opinion upon it.

Assuming for the present that the proviso contained in the side agreement reserved the right to the North and West Companies to attack the bonds and the operating agreement, notwithstanding the benefits obtained by them from the transactions giving rise to that agreement under the leases and that instrument, the effect of the paragraph as to the Consolidated stock is to be determined. Complainants do not reserve the right to attack the transfer of the stock from Yerkes to the Union Company, and they treat the stock as wholly valid, claiming that it is theirs, and entitles them to control the Consolidated Company. If they had originally no right to this stock, or if they are now precluded by their acts from claiming it, they would seem to have no right to attack the Consolidated bonds or mortgage. Their right to attack these appears to be dependent on their standing as virtual stockholders, holding beneficial title to the stock through Yerkes as their trusted agent and fiduciary. Without owning the Consolidated stock, so as to give them some interest in the Consolidated Company's property, what concern have they in setting aside the bonds? How is their interest injuriously affected so long as they are not shareholders or property owners? They have agreed that for 984 years the Union Company may be the practical owner of the Consolidated lines, and may pay the interest on such bonds and deduct the amount from the rent. They have also agreed that for the same period the Union Company may continue to hold the stock and vote it for their benefit in so controlling the Consolidated Company's lines as to be able to pay the rent. By so agreeing they accept the benefit of the means by which the Union Company obtained the stock; that is, through the Yerkes transfer, which was the consideration for the issue of the bonds to Yerkes. He surrendered the stock to get the bonds. North and West then agreed to confirm this transfer by securing from the transferee, the Union Company, a pledge to hold and vote this stock for their benefit. Four times a year, when the North and West Companies accept the quarterly rent payments they again and again affirm the validity of the transferree's title and the title of Yerkes, as the transferror of the stock. And so they will go on affirming it for nearly 10 centuries, unless default be made in the amended leases; and even in that event they will again affirm it, by becoming the absolute owners of the Consolidated Company's stock by conveyance from the Union Company through the Yerkes transfer; thus obtaining it by a chain of title entirely independent of that of trust ex maleficio, as set up in their bills. As to the comprehensive interest now held by the Union Company in the property of the Consolidated Company, see Chicago Union Traction Co. v. Chicago (Ill.) 65 N. E. 470.

What right have they to attack a title so persistently affirmed, and which they would continue to affirm, every three months, even after they had successfully destroyed it, if they should gain these suits? Is a court of equity to permit them to take such inconsistent positions and continue to occupy them for nearly 1,000 years? It is said that

Yerkes was not a party to the amended leases or the side agreement, and the position occupied by him and his estate has not been changed to their disadvantage, hence, the estate cannot rely on the estoppel, because estoppels are mutual, and that there has been no reliance by him or his executor on these instruments, and therefore the law of quasi estoppel or inconsistent positions has no application. A little reflection, however, will break the force of these suggestions. The beneficial interest secured by the North and West Companies in the stock by the third clause of the side agreement was derived from the Union Company holding by the Yerkes transfer. That clause provides that the Union Company shall cause the stock to be voted so as to cause the side agreement to be carried into effect—that is, to control and operate the Consolidated lines as operated at the date of the agreement, take all steps and cause all acts to be done and all payments to be made necessary to maintain the then existing relations of the Union and Consolidated Companies—further, that any interest or rights in the stock acquired by the Union Company shall be held and owned for the joint benefit of the North, West, and Union Companies, for the sole purpose of carrying into effect the provisions of the side agreement and the leases, and, if the leases be forfeited, the North and West Companies shall own the stock. The words "any interest or rights" mean the legal title to the stock, carrying the full power of control of the Consolidated lines, the same title held by Yerkes. The North and West, therefore, get the benefit of the Yerkes transfer (1) by obtaining all the net earnings of the Consolidated lines for the full term of the amended leases up to the maximum rent reserved; (2) they get the full equitable and legal title to the stock if the leases are forfeited by default. Both these important and valuable rights, one in possession and the other in contingent expectancy, they get solely through the Yerkes transfer. But such transfer was burdened by the lien of the bonds, and Yerkes exacted an agreement that the stock should be deposited with the Equitable Trust Company as security for the bonds. In substance and effect it was a sale of the stock with a mortgage back, in the form of a trust pledge from the Union Company to Yerkes. The stock was thus mortgaged stock, subject to the lien for Yerkes' benefit. The North and West Companies then make a conditional purchase of this incumbered stock from Yerkes' transferee—not only purchase it, but stipulate for its continued use for their benefit for 1,000 years. They reassert such title and the interest of Yerkes every three months, and then bring bills to set aside the incumbrance subject to which they take, and to assert an entirely independent and hostile interest. A grantee cannot, while asserting rights under the deed, dispute the title so as to avoid the payment of the purchase price. 11 Am. & Eng. Encyc. 441, and cases cited. Recitals in a deed are binding on the grantee where he bases his rights on it. 16 Cyc. 700.

The case of Brazee v. Schofield, 124 U. S. 495, 31 L. Ed. 484, 8 Sup. Ct. 604, is in point. There a husband and wife settled on land in Washington Territory, under the Oregon territorial act, allowing each settler 640 acres of land. They made improvements and became entitled to the land under the territorial act and subsequent federal statutes. The husband died, and the heirs and widow divided the

land, the east half to the widow and the west half to the heirs. The heirs then procured a partition of the west half into 10 parts. One of the heirs was a minor, and his portion was sold and conveyed by guardian's deed under order of the probate court to the defendant, April 29, 1865. Defendant took possession and made improvements. Afterwards, and in 1874, a donation certificate was issued by the Land Office, by which the west half was assigned to the heirs and the east half to the widow, long after her death. In 1877 a patent was issued granting the west half in the deceased husband and his heirs, and the east half to the deceased widow and her heirs. All the heirs of the husband then joined in a deed to plaintiff of the land conveyed to defendant by the guardian in 1865. Plaintiff then brought ejectment. He claimed that the proceedings essential to vest the title under the acts of Congress had not been taken, particularly in respect to the giving of notice by the settler, and therefore defendant's grantor had no title in advance of the certificate and patent. But it was held that plaintiff, having derived all the title he asserted through conveyance from the heirs of the settler, was estopped to claim that the latter had not resided on and cultivated the land, and made full compliance with the essential requirements of the donation act. So, in this case, complainants, asserting an interest in the stock under the Yerkes assignment, are estopped to question his interest so long as they take the benefit of the side agreement. Prof. Bigelow says that the privies of grantor and grantee, to the same extent as the original parties to the deed, may take advantage of the estoppel, but that persons claiming under an independent title are not estopped unless they succeed to or hold under the title to which the deed relates. And he gives several illustrations, and cites many cases, in support of the rule. 16 Cyc. 715, 716. Possibly the North and West Companies might, in a proper case, attack the Consolidated mortgage as ultra vires, as an unlawful burden on their right to rents under the amended leases, unless they are precluded from so doing by their agreement to maintain existing conditions, and that the Union Company shall pay interest on the bonds; but that is not this case. They assert no rights under the side agreement, which is not in any way referred to in the bills. They stand wholly on their right to enforce the trust ex maleficio, arising from Yerkes' alleged frauds.

But, even if the Yerkes estate cannot rely on this estoppel, the other view of the matter seems equally conclusive. As has been said, the case of the complainants substantially depends on their alleged beneficial ownership of the stock in the hands of Yerkes as their fiduciary. If they fail on this ground, they make no such case as would authorize the court to set aside the Consolidated Company's bonds or mortgage simply for the reason that to do so might increase their rent under the amended leases and side agreement. They do not state a case for any such relief, nor would it be germane to the case made in their bills. Without the stock, then, they have no interest to avoid the bonds or mortgage, since their property is not incumbered by them. Therefore, if complainants have precluded themselves from reclaiming the stock from the Union Company, the relief they ask

against the Yerkes estate and Parsons is of no consequence. If they are estopped as to the Union Company by the amended leases and side agreement from claiming ownership of the stock through Yerkes' alleged frauds, then they are in no position to attack the Consolidated bonds or mortgage, at least under the case made by the bills. So far as their right to claim the stock from the Union Company by any title independent of the side agreement is concerned, that agreement would seem to amount to an absolute and complete estoppel, so long as they take its benefits, both by deed and in pais by quasi estoppel. So long as that sealed contract stands, they are bound by its terms, and are estopped by their deed to upset the right to the control of the stock by the Union Company for the leasehold term of 984 years. Not only does that agreement show on its face that they claimed the bonds and mortgage were possibly invalid, but they did not then nor do they now claim that any invalidity attaches to the stock, which is the main consideration in the whole situation. And so long as the side agreement or the modified leases stand complainants are in no position to plead want of knowledge of facts which might have led them to take a different step or make a different contract. It seems, also, that the rule of inconsistent positions or quasi-estoppel applies as between the North and West and Union Companies. This subject is considered by Prof. Bigelow in his recent article on estoppel in 16 Cyc. 782. It seems from an examination of many of the cases cited by him that, if a person avails himself of the benefit of a transaction, he cannot be heard to deny its validity. The same rule is held in International Contracting Co. v. Lamont, 155 U. S. 303, 15 Sup. Ct. 97, 39 L. Ed. 160 (cited as United States v. Lamont), and Wormser v. Metropolitan St. R. Co., 184 N. Y. 83, 90, 76 N. E. 1036, Id., 98 App. Div. 29, 90 N. Y. Supp. 714. See, also, Brazee v. Schofield, 124 U. S. 495, 8 Sup. Ct. 604, 31 L. Ed. 484, above referred to.

Counsel for complainants suggest that the transaction between Yerkes and the Union Company was simply a division of the spoils; and this is the allegation of the bills. Upon this theory it is argued that the North and West Companies had the right to settle or litigate separately with the Union Company and the Yerkes interests, obtaining by adjustment what they could from one, and then pursuing the other for his share of the plunder. A complete answer to this suggestion seems to be that by dealing with the Union Company, through the amended leases and side agreement, the North and West Companies have precluded themselves from ever obtaining the stock as cestuis que trust of Yerkes, according to the theory of their bills, but that their so obtaining it is a condition precedent to their right to either attack or obtain the bonds or mortgage. Therefore their settlement with the Traction Company, which forecloses them from obtaining the stock by a hostile title, and prevents them from denying the title of the Union Company derived from Yerkes, puts them in a position where they have no interest to serve by attacking the bonds or mortgage. The interest in the stock taken by them under the side agreement, and their continued acceptance of rent under the amended leases, denies and destroys their right to question the title of the Union

Company, or to assert an independent, hostile title to the stock, without which title they have no standing either to question or have delivery of the bonds.

In the prayers of the bills complainants also claim title to all the property of the constituent companies now vested in the Consolidated Company. If the fact that the lines were in part built with moneys of complainants, some of which it appears by the bills was repaid, and in part upon the credit of complainants, gives them title to the property—a proposition which it seems difficult to assent to—yet the same considerations of estoppel would seem to apply as in case of the stock. The agreement of the North and West Companies that the Union Company may control the property for their benefit to secure their rentals for 984 years would appear to be quite inconsistent with their claim to own the property, and thus deny all validity to the stock and all title of the Union Company thereto. And they have also agreed that existing relations shall be maintained, a thing impossible if they are to own the Consolidated property. I think, therefore, that the pleas of estoppel show that the North and West Companies are precluded by the amended leases and the side agreement from obtaining the title to the Consolidated Company's stock, and, having lost the right to do so, they have no such interest as entitles them to question the bonds or mortgage of the Consolidated Company, and that the pleas of the defendants Owsley, the Union Company, its receivers, and the Equitable Trust Company should be permitted filing and sustained as valid pleas. I have hesitated to reach this conclusion because if my views are not sustained as to the estoppel, and it is also held that the corporate character of the constituent companies can be ignored, and the fraud on them through the issue of the fictitious stock entirely disregarded, and that all such originally worthless stock shall by a court of equity be vested in the North and West Companies, in such case all the time consumed by possible trials of issues on the pleas and an appeal will be lost. In a case like this the matter of time is unusually important. But with my convictions on these questions I feel that the defendants should be entitled to a trial on the pleas. The Supreme Court has recognized the right to plead in U. S. v. California & Oregon Land Co., 148 U. S. 31, 13 Sup. Ct. 458, 37 L. Ed. 354, and I do not think that the peculiar circumstances of the case should induce me to overrule the pleas and defer the questions raised to the final hearing. In reaching this conclusion, I have been somewhat influenced by the fact that Mr. Yerkes is dead, thus making it more difficult to understand the circumstances under which the constituent companies were launched, and their stock taken over by him. I do not mean to intimate that this fact should prejudice complainants unnecessarily, as I think they acted with dispatch in bringing suit within a year and a half after they became able to do so. In view of the great complication of the situation, the many diverse and conflicting interests, and the difficulty of the questions involved, I think they acted promptly. But the fact remains that Mr. Yerkes is dead, and it may not be possible to reach as just a knowledge of the situation ten years ago as if he were living. Inasmuch as the release of Yerkes was part of the same transaction as the transfer of

the stock and issue of the bonds, the plea of defendant Owsley setting up that release is also allowed to be filed, and the plea held good.

In regard to the pleas of the Union Company and its receivers, each setting out the amended lease and the side agreement, they purport to cover the whole equity of the bills, including the question of the right of complainants to attack the two operating contracts. This makes it necessary to consider the effect on such contracts of the two papers pleaded. The side agreement expressly reserves the right to attack the validity of the second operating agreement. Assuming that these instruments would ratify that agreement and prevent attack upon it, without the proviso reserving such right, the question is whether the proviso has any force. A somewhat similar question was ruled in the cases cited below. In the case of International Contracting Co. v. Lamont (cited as United States v. Lamont) 155 U. S. 303, 15 Sup. Ct. 97, 39 L. Ed. 160, a contractor's bid for dredging for the government was accepted by the engineers in charge, but the matter was held up by the Secretary of War. The work was readvertised, and pending this bid the contractor commenced a mandamus suit to compel the Secretary of War to sign a contract with him under his first bid. Before this suit was disposed of the bids under the second advertisement were opened, and it was found that the same contractor was again the lowest bidder, at a price much lower than his first bid. Being again the lowest bidder, he obtained a contract for the work, and the mandamus proceeding was dismissed. The contractor then demanded of the Secretary of War that he should sign the contract awarding him the work under the first bid, which was refused. Thereupon the contractor again commenced a mandamus to compel the execution of a contract under the first bid. The court, after holding that mandamus would not lie in such a case, proceeded as follows:

"But, even if the writ of mandamus could be so perverted as to make it serve the purposes of an ordinary suit, the relator is in no position to avail himself of such relief. He entered of his own accord into the the second contract, and has acted under it and has taken advantages which resulted from his action under it, having received the compensation which was to be paid under its terms. Having done all this, he is estopped from denying the validity of the contract. Oregonian Railway v. Oregon Railway, 10 Sawy. 464, 22 Fed. 245. Nor does the fact that in making his second contract the relator protested that he had rights under the first better his position. If he had any such rights and desired to maintain them, he should have abstained from putting himself in a position where he voluntarily took advantage of the second opportunity to secure the work. A party cannot avoid the legal consequences of his acts by protesting at the time he does them that he does not intend to subject himself to such consequences. In the case of Bank of the United States v. Bank of Washington, 6 Pet. (U. S.) 8, 8 L. Ed. 299, certain payments had been made to the first bank upon a decision by the court below, with notice that the payor intended to take the case to the Supreme Court of the United States, and would expect the payee, the Bank of the United States, to refund the money if that court should reverse the decision of the court below, and hold that it was not due. The court said: 'No notice whatever could change the rights of the parties so as to make the Bank of the United States responsible to refund the money.' The whole case of this relator is covered by Gilbert v. United States, 8 Wall. (U. S.) 358, 19 L. Ed., in which this court, through Mr. Justice Miller, said: 'If the claimants had any objection to the provisions of the contract they signed, they should have refused to make it. Having made it

and executed it, their mouths are closed against any denial that it superseded all previous arrangements.' "

A similar question was presented in Wormser v. Metropolitan Street Railway Co., 184 N. Y. 83, 76 N. E. 1036. In that case a street railroad corporation was reorganized for the purpose of extending its road. The plaintiff, one of the stockholders of the company, brought on behalf of the plaintiff and all other stockholders similarly situated a suit to enjoin the company and another company connected with it from carrying out the reorganization plan, and to have the same set aside as illegal and void. It appeared, however, that after suit brought, but before the answer was put in, the plaintiff availed himself of the plan by subscribing to the capital stock of the new company, and then sold his option or privilege to third persons for over $5,000. He made this subscription under protest, claiming it to be only to preserve his rights. The court held that he had ratified the plan of reorganization and was estopped. The court quote the language from the Lamont Case, taking the position that plaintiff, taking the inconsistent position under protest, could not be considered, and that a party cannot avoid the legal consequences of his acts by protesting at the time he does them that he does not intend to subject himself to such consequences. The language of the Supreme Court of Alabama in Robinson v. Pebworth, 71 Ala. 240, is quoted with approval, that an estoppel in a case of this kind simply means that you shall not take the fruits of an illegal transaction and afterwards set the transaction aside as illegal.

The second operating agreement is confined in its operation to 50 years from December 1, 1899. But the side agreement obligates the Union Company to maintain existing relations for 984 years, unless the parties otherwise agree. So the operating agreement is extended to the full life of the amended lease. If those leases are forfeited, the North and West Companies become owners of the Consolidated stock, so far as the legal title and full control of the feeder lines are concerned, and can make such an operating agreement as they choose. Suppose the operating agreement were set aside while the amended leases were still in force, would not the Union Company still be obliged to vote the Consolidated stock to carry into effect the provisions of the leases and to maintain existing relations between the Union and Consolidated Companies, using its control of the stock for the joint benefit of the North, West, and Union Companies? On the whole, I am inclined to think that the North and West Companies, so long as they claim under the side agreement and take the benefit of it, must submit to the provision that the Union Company shall hold the stock to carry out the leases and the side agreement, and to maintain existing traffic arrangements with the Consolidated Company, notwithstanding the proviso that the North and West Companies may contest the operating agreement.

In regard to the pleas of the Consolidated Company setting up entirely distinct grounds of estoppel to contest the operating agreements, I am inclined to think that the matter can be disposed of through the pleas of the Union Company. The motion to file pleas by the Consolidated Company is therefore denied. Complainants do not now,

as formerly, take any chances by replying to the pleas and thus taking issue thereon. Pearce v. Rice, 142 U. S. 28, 42, 12 Sup. Ct. 130, 35. L. Ed. 925; Horn v. Dry Dock Co., 150 U. S. 610, 14 Sup. Ct. 214, 37 L. Ed. 1199; Elgin Wind Power Co. v. Nichols, 12 C. C. A. 578, 65 Fed. 215. The case of Daniels v. Benedict, 38 C. C. A. 592, 97 Fed. 367, is not opposed to the cases in the Supreme Court, because the plea of separation in that case covered the whole equity of the bill.

The right to plead or answer to the amended bills: As stated above, complainants amended the bills by leave of court by joining as a party John B. Parsons, of Philadelphia. He is brought in as one of the represented defendants under the first paragraph of the bill, making Henry G. Foreman and others parties in their own right and as representatives of the owners of bonds, who are not joined because they are so numerous and their names are unknown, the evidence having developed that Mr. Parsons was from January 1, 1894, to January 12, 1897, vice president and general manager and a director of the complainant companies, and wrongfully co-operated with Yerkes to carry out the illegal purpose charged in the bill, the said Yerkes having admitted into said scheme and into a participation thereof the said Parsons, and that Parsons received a large number of shares of several of the constituent companies, and later received in lieu thereof 8,455 shares of the stock of the Consolidated Company, and on April 1, 1900, surrendered said shares to the Equitable Trust Company, and received in lieu thereof 380 of the Consolidated bonds, which said bonds said Parsons still owns. Such amendments having been made, certain of the defendants now move for leave to plead, answer, or demur anew to the bills, insisting that any amendment to the bills, however unimportant, gives all the defendants the right to plead as fully as if they were pleading to the original bills, even to the extent of putting in an entirely new defense. Counsel for complainants, on the other hand, submits that the defendants have only the right to plead, demur to, or answer the new matter contained in the amendments and that no substantial change was made in the bills; Parsons having been made a quasi party by paragraph 12 of each of the original bills, charging that Yerkes admitted into his scheme and a participation of the profits other officers and directors of the North and West Companies, and that such persons received such profits in the shape of shares, first of the constituent companies, and subsequently of the consolidated companies, but that complainants are unable to ascertain the names of such persons, and ask that, when discovered, they may be made parties defendant. The practice in respect to the right of a defendant, who has answered, to replead, demur, or answer anew after the bill is amended, seems to be quite unsettled. There is nothing in the equity rules adopted by the Supreme Court which throws any light upon the question. This being the case, the practice laid down in Justice Bradley's note to Thomson v. Wooster, 114 U. S. 104, 112, 5 Sup. Ct. 788, 29 L. Ed. 105, applies. Rule 90 of the equity rules provides as follows:

"In all cases where the rules prescribed by this court or by the circuit court do not apply, the practice of the circuit court shall be regulated by the present practice of the high court of chancery in England, so far as the same may reasonably be applied consistently with the local circumstances and local con-

veniences of the district where the court is held, not as positive rules, but as furnishing just analogies to regulate the practice."

In the note referred to Justice Bradley says that reference is made by this rule to the first edition of Daniell's Chancery Practice, published in 1837, as being, with the second edition of Smith's Practice, published the same year, the most authoritative work on English chancery practice in use in March, 1842, when the federal equity rules were adopted, supplemented by the general orders made by Lords Cottonham and Langdale in August, 1841. Such rules and orders, Justice Bradley says, exhibit that "present practice of the high court of chancery in England," which by the ninetieth rule was adopted as the standard of equity practice in cases where the rules prescribed by the Supreme Court or the Circuit Court, do not apply. The learned justice further says that the later editions of Mr. Daniell's work have been much modified by extensive changes introduced by the English orders of later date.

The rule quoted by counsel is found in the first edition of Dan. Ch. Pr.* 519 (307), and is as follows:

"It may be observed here that any amendment of a bill, however trifling and unimportant, authorizes a defendant, though not required to answer, to put in an answer making an entirely new defense and contradicting his former answer."

Mr. Daniell cites only one case, and that unreported, decided by Vice Chancellor Shadwell. In later editions to his work, however, he cites the case of Bosanquet v. Marsham, 4 Sim. 573, decided October 31, 1831, also a decision by Vice Chancellor Shadwell, who used the language quoted from Mr. Daniell. In the same edition of Mr. Daniell's work (*509 [301]) he lays down the rule as follows:

"But, although the original and amended bill constitute but one record, and are so considered at the hearing, the defendant, in case he has answered the original bill, ought to answer the amendments only." Citing only a practice work.

In the Bosanquet Case, above referred to, a general demurrer to a bill was overruled. Defendant then demurred ore tenus for want of parties, and that demurrer was allowed, with leave to plaintiff to amend. The bill was then amended by adding a party and charging him to be out of the jurisdiction, but the case made, and the relief prayed, remained the same as before. Defendant then put in a general demurrer to the amended bill. Plaintiff objected that defendant could not demur twice to the same matter. "The Vice Chancellor [Shadwell] said that after a defendant has answered a bill, if any amendment, however trifling, were made in it, it would be entirely competent to the defendant to put in another answer, and to make an entirely new defense; and that he thought the same rule applied to a demurrer." It will be noticed that this case was that of a new demurrer, and the Vice Chancellor refers to what he regards as the existing practice applying to an answer.

In Ellice v. Goodson, 3 Myl. & Cr. 653, decided in 1838, Vice Chancellor Shadwell had allowed a demurrer which had been interposed to a bill amended after answer. The amendments were considerable

in extent, but did not require any new engrossment of the bill. They consisted partly in expunging matter which stood in the original bill, and striking out the names of some defendants who turned out not to be interested in the controversy. The original bill was filed on behalf of the plaintiff and other specialty creditors, but by the amendments it was converted into a suit on behalf of the creditors generally. The Vice Chancellor allowed a demurrer to be pleaded to the amended bill and held the demurrer good. Lord Cottonham held that the answer standing upon the record operated to overrule and set aside the demurrer. He says that the defendant cannot justify repeating by his answer to the amended bill what he has stated in answer to the original bill, for it would clearly be impertinent for him to do so. He may introduce anything qualifying his former statements, but he cannot substantially repeat what he has said in his former answer, because to do that there is already an answer, and all he has to do is to complete the record. He can no more demur to that which he has before answered than he can answer to it. If the amendments make an entirely new case, the original bill would go out, and the answer would follow the same fate. The rule laid down in Ellice v. Goodson was changed by Order in Chancery No. 37, adopted in August, 1841, found in 1 Craig & Phillips, Rep. 379, and will be found also in Bates' Federal Practice. This rule provides that no demurrer or plea shall be held bad and overruled upon argument only because the answer of the defendant may extend to some part of the same matter which may be covered by such demurrer or plea. These citations show, I think, that the practice in England was not clearly settled at the time of the adoption of the federal rules of equity practice in 1842.

Counsel for defendants, however, cite the cases of Blythe v. Hinckley (C. C.) 84 Fed. 228, 244; Nelson v. Eaton, 13 C. C. A. 523, 66 Fed. 376; Fisher v. Simon, 14 C. C. A. 443, 67 Fed. 387; French v. Hay, 22 Wall. 238, 22 L. Ed. 854. In Blythe v. Hinckley defendants put in a cross-bill which was never answered, and then took a decree pro confesso for want of an answer. After taking this decree, they amended their cross-bill twice, not introducing new matter, but withdrawing allegations as to practice in another judicial district, and striking out the name of one of the original defendants in the cross-bill. Judge Morrill lays down the rule quoted from Daniell, but it is evident that the question here presented was not before him in any way. The defendants, not having answered at all, were, of course, entitled to answer fully the amended cross-bill. In Nelson v. Eaton, above cited, no answer of any kind was ever put in, but after a decree pro confesso was entered, and after defendants had moved to vacate the decree and either dismiss the bill for want of jurisdiction or for leave to answer, the court allowed complainant to amend his bill to show jurisdiction. Whereupon he denied the defendant's motion, and entered a final decree for the complainant. It was held on appeal that the defendant should have been allowed to answer. In this case, also, the question here involved was not presented. Fisher v. Simon, above cited, was also a case where no answer was ever put in. The court entered a decree supposing it to be interlocutory which was in fact final, and when his attention was called to it set aside the decree. After

the decree had been set aside complainant amended the bill so as to show the jurisdiction of the court, and the defendants were allowed to plead, whereupon plaintiff appealed. The question here pending was in no manner involved in the case. In French v. Hay, also above cited, complainant filed an amended bill entirely changing the case as to two of the defendants, attempting to charge them with the amount of certain rents due from another defendant who was insolvent. These defendants never appeared to or answered the amended bill. A decree pro confesso was entered against one of them for the value of the rents. Such defendant moved to set aside the decree, whereupon it was vacated in part, but left standing so as to charge him with the rents. He then answered as to the whole case. The court say that the general rule is that an amendment to the bill gives the defendant the right to answer as if he had not answered before. In view of the facts in the case, however, it is apparent that it is not authority on the question here presented. The language of Mr. Daniell above quoted has been repeated in a number of cases in the state courts, but there are many cases holding to the rule contended for by counsel for complainants, to the effect that a defendant has only a right to answer the new matter set up by amendment to the bill. It seems clear that such rule must apply to a case like this, where the complainant by the amendment simply brings in a represented party defendant, a person who was referred to in the original bill as unknown. Much confusion would result from adopting a rule that every time the complainant in an omnibus bill brings in a represented party complainant or defendant all the other defendants who have answered have the right to plead, answer, or demur anew, either contradicting their original answers or pleas or setting up any new defense. The following cases seem to sustain the rule contended for by defendants: Bowen v. Idley, 6 Paige (N. Y.) 46; Burney v. Ball, 24 Ga. 505. In Thomson v. Maxwell Land Grant Co., 3 N. M. 269, 6 Pac. 193, a bill was amended by eliminating certain portions, thus making an entirely new case. It was held that defendant might put in an entirely new answer, approving 1 Dan. Ch. Pr. 409, to the effect that the amendment to a bill after answer does not authorize a defendant to demur for any cause to which the original bill was open, unless the nature of the case is changed by the amendment. The court allowed the defendant to put in a new answer, notwithstanding that the Supreme Court of the United States had, on reversing a former decree in the same case, given leave to the defendant to answer any new matter contained in the amended bill. See, also, Bauer Grocery Co. v. Zelle, 172 Ill. 407, 50 N. E. 238. The case of Casserly v. Waite, 124 Mich. 157, 82 N. W. 841, 83 Am. St. Rep. 320, contains a satisfactory discussion of this subject, and holds that a purely formal amendment adding a new party defendant after answer, but in no way changing or affecting the rights of the answering defendant, does not authorize the latter to file an amended answer; his original answer having covered the particular defenses to the original bill. See, also, Keene v. Wheatley, Fed. Cas. No. 7,644, 9 Am. Law Reg. 33, 7 Leg. Int. 349, 4 Phila. 157, 5 Pa. Law J. Rep. 501. I think the motion of the defendants for leave to demur or plead or answer fully to the bills as amended should be denied.

The other motion is that the complainants be compelled to annex to their bills the side agreement fully set out above. This motion is made upon the ground that the bills, having stated that an agreement existed, and annexed that part of the agreement consisting of the amended leases and the tripartite agreement relating to the stock of the North and West Companies, ought to be compelled to complete the statement by attaching the rest of it. On this motion I adopt the practice stated by Judge Wheeler in Phelps v. Elliott (C. C.) 26 Fed. 881, to the effect that the practice under a state Code, to require the plaintiff to make his complaint more definite and certain, does not apply to the equity side of the Circuit Court, and that in a suit in equity the defendant has no right to have the plaintiff amend his bill, nor is it required of him so to do, nor to expose defects or supposed defects in his case. On the argument of this matter I thought that the motion did not involve an amendment of the bills, because it is therein stated that an agreement was made, and I thought that annexing the whole agreement by attaching a copy of the side agreement, by which the whole contract between the parties was completed, would not operate as an amendment to the bill. Further reflection, however, has convinced me that the bills would be in substance and effect amended, and the case somewhat changed by attaching the agreement in question. This motion is also denied.

Pleas No. 5 in Case 27,508, and No. 9 in 27,509, the amended fourth plea in 27,508, and amended eighth plea in 27,509, all proposed by the defendant Owsley, are allowed to be filed, and are sustained. The proposed pleas of the Union Company and Equitable Trust Company, to be amended by alleging that the side agreement was approved by the receivers, are allowed filing and sustained. The defendant Foreman did not file any plea of estoppel. If defendant Parsons elects to enter a general appearance, he has the right to plead, answer or demur, as he shall be advised. All other pleas filed or proposed are overruled.

## On Motion for Leave to Amend Bills.

The pleas of estoppel and release having been sustained, pursuant to the opinion filed December 17, 1906, complainants move to a nd the bills in order to set up matters in avoidance of the pleas and in some other respects. The amendment relating to the matter of estoppel is, in substance, as follows: The negotiations resulting in amending the leases were conducted on behalf of complainants by the protective committees, who requested the Union Company to cause the dummy directors to resign and the protective committees to be elected directors in their place; also to allow the protective committees to examine the books and papers of the North and West Companies, in order to familiarize themselves with the facts affecting their interests. The Union Company refused to grant their request until the protective committees should first agree upon the terms of the amended leases. By reason of the refusal the committees could not acquire and did not have any knowledge of the facts stated in the bill in respect to the alleged Yerkes frauds, the operating agreement, the Consolidated Company mortgage, nor the Yerkes release. While negotiations were being conducted, the question arose whether the Consolidated lines should be included in the

arrangement. The committees stated to the Union Company their willingness to include said lines, if it could be done without prejudice to their rights in the Consolidated System, and without prejudicing any controversy in respect thereto, or its ownership or stock or the validity of its bonds. It was then stated that such an agreement could legally be drawn, whereupon the committees assented to the putting in of the Consolidated System, and the attorney of the Union Company was designated to draw such an agreement. Shortly thereafter, and at the meeting when the dummy directors resigned and the committees were elected in their place, and the amended leases approved, a draft of the side agreement was produced by the attorney of the Union Company, who stated to the new directors that the agreement was drawn without prejudice to, and so as to leave open for further adjustment or litigation, all controversies that did or might arise respecting the validity of the Consolidated bonds, or respecting the Consolidated System and its ownership, its stock, the operating agreement, and all transactions respecting the same. Thereupon, relying on said statement and ignorant of any of the facts relating to the same, except as disclosed by the side agreement, the directors authorized its execution. The agreement is set out in the amendment as it appears in the opinion heretofore filed, and following the signatures and seals of the receivers of the North, West, and Union Companies, bearing date November 12, 1903, and an order is recited in connection with the execution by the receivers, made by this court November 12, 1903, authorizing the approval and directing the receivers to join in the execution of the agreement.

It is also averred by the amendment that it was not the intention of the parties to the agreement to have it admit or recognize the validity of bonds, release, operating agreements, or ownership of the stock by the Union Company, or to provide that the other parties to the agreement should thereby acquire or purchase the stock from the Union Company, but that the mutual intention of all the parties was that if the Union Company had any interest in the stock, which was not admitted or intended to be, such interest should be surrendered to the extent of being brought under the amended leases, and the making of such arrangement and agreement should be without prejudice to any controversy or claim which might arise and exist as to the validity of the bonds, operating agreement, ownership of the stock, or the right of either party to own or claim it independent of the contract; that if such agreement as drawn, when properly construed, recognizes the validity of the bonds or operating agreement or ownership by the Union Company of the stock, or prevents complainants from contesting such validity or claiming the stock by independent title, then the agreement does not correctly express the mutual intention of the parties, but is the result of a mutual mistake or the mistake of complainants, coupled with the fault, negligence, or misconduct of the Union Company in drawing the agreement and representing to the complainants its contents, force, and effect; that since the making of the agreement the Consolidated Company has been in possession and control of all its railways, and during all of said time they have been operated at a loss, and such deficit has been met by moneys loaned to the Consolidated

Company by the receivers of the Union Company out of the earnings of the North and West Companies.

Paragraph 9a of the prayer of the bill is amended so as to ask that, if the side agreement be construed to estop complainants from maintaining this suit, then that it be corrected so as to provide that nothing in the agreement contained shall operate or be construed to prevent the parties from questioning the validity or ownership of the bonds, the validity of either operating agreement, the Yerkes release, and from contending that the transactions which resulted in the issue of the bonds and the execution of the release were fraudulent, or to interfere with or prevent complainants from claiming that all the stock was, before making the agreement and still is, the property of the complainants, and that the Union Company then had and now has no interest in or title thereto.

By an amendment to paragraph 30 of the bill in the case of the North Company, it is alleged that a dividend of $88,000, as provided in the amended lease, was paid by the receivers of the Union Company to the stockholders of the North Company October 15, 1903, but that neither the stockholders nor the North Company have received any other moneys by way of rentals or dividends under the amended lease. A further amendment is sought to be made to the bills, by which the complainants claim that an issue of stock of the Chicago North Shore Electric Railway Company to the amount of $400,000 to Charles T. Yerkes, May 10, 1894, be held to be the property of the complainants; said stock having been obtained by said Yerkes as particularly alleged in the amendment in substantially the same way as the stock of the subsidiary companies. This amendment was objected to on the ground that it makes the bill multifarious, as none of the defendants are interested in it except the executor of the Yerkes estate. All the amendments sought to be made were allowed by the court, except the amendment found on page 4 of the amendments, alleging that the Consolidated bonds were delivered directly to the trust company, instead of being delivered to the Traction Company, and by it delivered to the trust company. This amendment was not allowed because thought to raise an entirely immaterial issue. These amendments having been allowed, hearing was had on the question whether the amendment as to the side agreement changes the conclusions arrived at in the orders allowing the pleas. One of the purposes of this amendment is to bring this case within the case of Bybee v. Railroad, 139 U. S. 663, 11 Sup. Ct. 641, 35 L. Ed. 305. In that case the railroad company was entitled to certain lands under a congressional land grant. The grant was made by the act of July 25, 1866, and was a grant in præsenti. On May 17, 1879, one Fisher attempted to appropriate to his own use under the mining laws of the United States a portion of the lands previously granted to the company, and constructed a ditch thereon, and on which its right of way had been laid out. The railroad company was then the owner of the right of way upon which the ditch was located, but, under a misapprehension of its rights and a mistake of law it erroneously supposed that its title had not vested, and that the appropriation of Fisher under the mining laws was valid; whereupon a deed was

made from Bybee and Fisher (Bybee claiming to be a co-tenant) to the railroad company for a consideration of $250 paid, and containing a condition against impairing or destroying the ditch; the only right conveyed being a license "to enter on said ditch and construct and operate its road over the same" upon such condition. The road was constructed over the ditch, which was not kept in proper repair, and Bybee brought suit for damages to the ditch and water right occasioned by the construction of the railroad. The complaint alleged that the defendant accepted the deed, received possession of the water ditch and constructed its railroad and telegraph line across it, but in such a manner as to permanently obstruct and destroy it and render it impossible to use it for the conveyance of water, and refused to make any compensation to the plaintiff for his interest therein. The court held that the relationship between the parties was that of vendor and vendee, and not landlord and tenant, as the deed was the conveyance of a perpetual right for a solid consideration therein expressed, and there was no covenant for the payment of any rent for the redelivery of possession; that the grantee is not estopped to deny the title of his grantor except under circumstances which would render the repudiation of the grantor's title a breach of good faith and common honesty on the part of the grantee. It was further held that the railroad company was not bound to surrender possession taken under the deed before disputing the title of the grantor; such rule being obviously inapplicable to a case where the only possession consisted in the disturbance of a water right by the construction of the road across the ditch. This would be a useless and expensive formality. The doctrine of estoppel exists only where there is an obligation to restore possession of land upon certain contingencies such as exist between landlord and tenant or mortgagor and mortgagee. It was not a breach of good faith on the part of the defendant to set up its prior title. The deed was evidently delivered and received under a misapprehension of legal rights and it would be manifestly unjust to hold the defendant forever estopped from asserting its own title.

The complainants seek to put themselves within the rule of this case by making the amendments in question as to the side agreement, and the question is whether the amendment so allowed should change the conclusions formerly reached. Question is suggested whether the court could properly grant a reformation of the contract in the respects suggested, whether the action of the court and receivers in approving the side agreement and amended leases is entitled to have any binding effect, and whether the complainants have taken the benefit of the side agreement or amended leases since they discovered the facts alleged in the bills. By one of the amendments allowed it is averred that the complainants did not have knowledge of the facts so stated until the 1st day of February, 1904; the bills being filed December 1, 1904. At the date of the amended leases and side agreement, July 24, 1903, the title to the rights of action asserted in these cases was vested in the receivers of complainants by assignment following the appointment. This appears from the bills. The leases and side agreement were at first executed only by the parties. Later on the court, by

order of November 12, 1903, directed the receivers—they still being possessed of the causes of action—to join in the agreement, and the receivers of the three corporations, North, West, and Union companies, thereupon signed and sealed the amended leases and side agreement. There is no allegation that at this time the receivers were not fully informed of all the facts alleged in the bills. The causes of action were theirs. These suits are brought in their right, and any relief decreed would belong to the trust. It must be presumed that the receivers acted with deliberation in deciding to approve the agreement, to retain the Consolidated system, and adopt the operating agreement. By November, 1903, the whole situation was before them. The Consolidated roads were not paying expenses; running behind. But the property was of great prospective value. There may have been danger of a coalition between the Consolidated and Elevated roads, injurious to the North and West properties. They fully understood the relation of the feeders with the main lines, and, notwithstanding the burdens on the Consolidated property, the receivers were directed to approve the instruments by which it was put into the leases, deciding it was in the interest of North and West, of the whole system, to keep on. The receivers were charged with the difficult and important duty of representing all interests involved. The rights of action were then owned by the receivers, representing all parties. There was an election to approve or disapprove the side agreement and amended leases. They were made after the receivership, and in no way binding on the court or receivers. Whether they should be adopted was entirely in discretion; and the receivers, in view of the whole situation, in possession of the property, representing the best interests of all parties, decided to take the benefit of these instruments, and approve and confirm them.

Afterwards, and by February 1, 1904, North and West companies became fully informed of all the facts stated in their bills. Acting for them, and all other parties in interest, the receivers had adopted the agreement of 1903, approving it as beneficial. The receivers still held and controlled all right of action against Yerkes and the Union Company now sought to be enforced in these suits, and these cases are now being prosecuted in their interest, as their cause of action, and for the benefit of the trust represented by them. Desiring to enforce such cause of action, complainants requested the receivers to bring a suit containing the allegations of the bills, but, they having declined to do so, complainants, for the purpose of enforcing the same cause of action, themselves filed the bills. This was done December 1, 1904. As has been stated, complainants ignored the side agreement until brought to the attention of the court by the pleas. When the pleas were sustained, the amendment was presented, and was allowed for the reason that it was thought that complainants should be permitted to make the case in their own way, in order that the court might be fully apprised of their position, and in order that the case might be disposed of as fully as possible on appeal. The receivers, under direction of the court, having approved the leases and side agreement as beneficial to the interests of all parties, the question arises whether

the complainants were under any obligation to do what they could to repudiate the action of the receivers before bringing this suit. The property was and still is in the control of the receivers. The complainants had no control over it, and they could not do anything to affect the custody or possession of the court through the receivers. They could, however, protest that they did not propose to be bound by that part of the amended leases putting in the Consolidated lines, nor by the side agreement fixing their rights in respect to those lines, for the reason that leases and agreement were made by them under misapprehension of their legal rights. They did not see fit to take this position, and they have themselves, to some extent, approved the agreement of July 24, 1903. One payment of rent was made to the stockholders of both companies under the amended leases before complainants learned the facts alleged in the bill. They have not returned or offered to return the money so paid. It is possible, however, that they would have been entitled to this at all events under the original leases, so that this fact would not be of any importance had they protested against being bound by the amended leases and side agreement after their approval by the court and receivers. It also appears that within a year past complainants filed petitions in this court in the receivership suit, alleging that the Union Company was in default under some of the provisions of the amended leases, and asking that those leases be forfeited. The result of such a forfeiture would, of course, give the North and West Companies title to the Consolidated under the side agreement. They have thus availed themselves, relied upon, and taken the benefit of a part of the agreement of July 24, 1904, consisting of the amended leases, side agreement, and amended tripartite agreement. By so doing, it would seem reasonably clear, at least, that they have affirmed the contract as a whole, including the side agreement. Certainly it must be concluded, in view of the acts of the receivers taken for their benefit, their failure to protest or repudiate the side contract or any other part of the agreement of 1903, their failure to return or offer to return the rent, and their relying upon the same contract in the petitions referred to, that they have elected to affirm the agreement of 1903, and are thus by their conduct estopped or prevented from attacking the title of the Union Company in respect to the stock, or asserting any other or hostile interest therein. It seems clear to me that complainants, after obtaining full knowledge, have thus approved and taken the benefit of the agreement of 1903, consisting in part of the amended leases and side agreement, have made their election, and are estopped to maintain these suits by attacking the title to the Consolidated stock which supports the agreement of 1903.

Another question is yet to be considered—whether the amendment in respect to the side agreement makes necessary a change in the conclusions reached on the former hearing on the pleas. Counsel now claim that the estoppel created by the side agreement is gone, because the parties agreed that no estoppel should exist. They expressly stipulated that the North and West Companies might contend that the Consolidated stock was not owned by the Union Com-

pany, nor any interest in it. Having this right of attack, it is said, the whole field is open, complainants have full liberty to claim the stock, avoid the bonds, deny the operating agreement, claim ownership or control of the Consolidated roads, take any position they please inconsistent with the leases and side agreement, because it has been expressly agreed that they may do so. Let us see how far this newly discovered privilege of attack carries, what effect it would have if established, and where it would leave the property and the important interests secured by the agreement of 1903, including in the new arrangement the Consolidated lines. The stock title of the Union Company was the sole basis of including in the leases the Consolidated lines. It alone supports the bonds, the mortgage, the Union Company's guaranty, and the Yerkes release. Without it, the stipulation to pay rent out of Consolidated earnings, the agreement to maintain the status quo and the operating agreement, to vote the stock for mutual benefit, vest title to the stock in complainants on default, or in the Union company on performance, to pay taxes on the Consolidated property, interest on its bonds, damages on its lines—all go out. The Union Company's stock title and the Yerkes transfer sustain and support these, each and every one. Successful attack on the stock title will destroy all, and a right of attack threatens all, except the guaranty. This may possibly endure to trouble the Union Company even after the mortgage interest sustaining it is swept away.

These very serious and far-reaching consequences of successful attack on the Union Company's stock title merit most careful consideration. If the Union Company loses the stock, it loses also the power to do any of the things it agrees to do in the side agreement, and some of those which it agrees to do, and has the right to do, under the amended leases. Losing the stock it loses the Consolidated roads, the operating agreements, the mortgage fund supporting its guaranty, the present income, and the probability of enormous future return from the Consolidated lines. It loses also, the conditional title to the stock which depends on surrender or full performance of the leases. All it retains is the enormous burden of the guaranty, stripped of the supporting fund. At the hearing on the pleas I thought that the stipulation for attack on the bonds and operating contract did not deprive the leases and side agreement—all being one contract— of the essential element of mutuality, because there was no right of attack on the stock title, the supporting arch of the whole structure. With the stock title intact in the Union Company, and the supposed acquiescence of complainants in the validity of that title, it seemed that the reservation for attack did not go far enough, giving the North and West Companies no standing to disturb the legal relations depending on the bonds, the mortgage, the operating contract, or the Yerkes release.

The admitted new agreement, however, goes the full length. Assuming the allegations of the bills to be true (as must be done at this stage, since the pleas of estoppel and release are still on the record, followed by demurrers to the new matter), the Union Company knew all about the Yerkes frauds, and simply divided with him the plunder.

A mere volunteer, it got no better title than Yerkes had—a mere equity in complainants' property.    In this position, charged with this knowledge, it specifically and solemnly contracted, as it now fully confesses, that complainants might bring on a general attack all along the line, if they desired, which would deprive it of all the stock, and destroy all its powers, duties, and rights as to the Consolidated property.    By its own deliberate agreement it gave complainants the power to saddle it with an enormous debt as guarantor, at the same time giving up its security therefor.    It allowed them to make the side agreement nugatory.    It agreed that the Consolidated lines might go out, gave up the all-important prospect of large future returns from the Consolidated lines for nearly 1000 years, relinquished them all to complainants— all in the same breath with its contract to maintain existing relations, and do many other things depending solely on its stock ownership. Every recital of the side agreement, every stipulation of the amended leases which relates to the consolidated property, are thus made nugatory and wiped out, at the option of the North and West Companies. The side agreement is thus only an armistice, to enable complainants to decide whether they will or will not be bound by it; and the amended leases also are rendered of doubtful validity.    That such an option to be bound or not, at the election of one contractor, destroys mutuality, and renders the contract void, see Vogel v. Pekoc, 157 Ill. 339, 42 N. E. 386, 30 L. R. A. 491; Woodland Oil Co. v. Crawford, 55 Ohio St. 161, 44 N. E. 1093, 34 L. R. A. 62; Cummer v. Butts, 40 Mich. 322, 29 Am. Rep. 530; Hoffman v. Maffioli, 104 Wis. 630, 80 N. W. 1032, 47 L. R. A. 427; 1 Page on Contracts, § 304, and cases cited.

Is this an extreme or exaggerated statement of the effect of a stipulation in the side contract to permit complainants to contend that the Union Company has no title to the stock?    Certainly it gives complainants an option not to be bound by the side agreement, the power to escape its obligation, and nullify all the large interests depending on the stock ownership and control of the Union Company; and they now ask the court, under its power to act as equity and good conscience require, by a belated amendment, to insert in the side agreement a provision which may destroy great interests, produce disorder, and confusion, and lay a heavy hand on the Union Company.    Would a court of equity be justified in permitting correction under such circumstances?    Complainants first ignore the side agreement, then assert it to be immaterial, and finally ask its correction so as not to embarrass them.    The bills state the agreement of July 24, 1903, include some of it and omit the rest.    Counsel for the Yerkes estate assert their ignorance of the side agreement for some time after suit commenced. When they discovered it, they sought to set it up in a plea.    Upon the hearing complainants' counsel supposed, and so stated, that the Union Company did not rely on the agreement as an estoppel, regarding it as unimportant in its effect on these suits.    Learning of this statement, counsel for the Union Company asked leave to withdraw its answer and file a plea of estoppel, which was granted; the Equitable Trust Company and Consolidated Company doing the same.    Then, after the pleas were allowed, complainants obtained leave to amend by alleging

150 F.—41

mistake in the proviso to the side agreement, and asking for its correction, if it should be held to estop them in these suits. Reformation of an instrument in equity should not be granted when it would introduce disorder and confusion, unsettle rights or interests, or injuriously affect security for obligations; certainly not when it would or might destroy mutuality, and render the instrument, and others forming part of the same agreement, of doubtful validity. Bybee v. Railroad bears a very remote analogy to this case so far as the facts are concerned. It does show, however, that some of the conclusions of the first opinion, as to the estoppel of Yerkes as a vendor in the stock assignment, were wrong. It is also in point to relieve complainants of the consequences of inadvertently entering into the agreement of 1903, as shown by the amendment. But it in no way relieves them of the consequences of what has happened since their ignorance has been removed.

Counsel for complainants insist that they may wait until this suit is decided, and, if it goes against them, may take the stock under the side agreement. If they gain it, the court, as a condition of relief, may require them to surrender to the Union Company any interest in the stock secured by the side agreement; that is, after complainant's title to the stock is confirmed, and they have control thereby of the Consolidated lines, and after it has been decided that the Union Company never had any title to the stock, and the side agreement had nothing to operate on, and passed nothing, that what it did pass—that is, nothing at all—be given up to the Union Company, possibly to enable it to pay its big guaranty after the mortgage security supporting it is gone. Suppose complainants should succeed in these suits, but should be decreed to be entitled to less than half of the Consolidated stock, less than a controlling interest, what would be their position then as to conditions of relief?

Counsel cite a number of cases of rescission where, under peculiar circumstances, persons seeking to avoid transactions were allowed at the trial to restore benefits received, which the general rule requires to be restored promptly, and as soon as grounds of rescission are discovered. These cases do not bear any resemblance whatever to this one. They are Kley v. Healey, 127 N. Y. 555, 28 N. E. 593; Hollenback v. Shoyer, 16 Wis. 499; Winter v. K. C. Cable Ry., 160 Mo. 159, 61 S. W. 606; Metropolitan El. R. Co. v. Manhattan R. Co., 14 Abb. N. C. 229; Du Pont v. Du Bos, 52 S. C. 244, 29 S. E. 665; Billings v. Aspen Min. Co., 51 Fed. 338, 348, 349, 2 C. C. A. 252. These cases and many others along the same line simply establish the rule that where there is a liability admitted or established in favor of the person who rescinds the contract, so that he has a clear right to retain a certain amount of money or certain property, he may retain the money or property upon the admitted or established liability. In other cases he must, upon discovery of grounds of rescission, promptly return what he has received. On this question, see Castle Creek Water Co. v. Aspin (C. C. A.) 146 Fed. 8; Heck v. Railway Co. (C. C.) 147 Fed. 775; Barker v. N. P. R. Co. (C. C.) 65 Fed. 460; Hill v. N. P. R. Co., 113 Fed. 914, 51 C. C. A. 544. A number of other cases are cited by Judge Lewis in his opinion in the Heck Case. Un-

der this rule it is probable that complainants would not be required to return the payment of rental made after the execution of the amended leases, for the reason that they were entitled, as I understand the facts, to the amount received under the original leases, but in view of the adoption of the leases for their benefit and in their interests by their receivers, and their filing petitions depending upon the terms of the amended leases, asking that a default be enforced, I think they have made their election to stand upon the agreement of July 24, 1903, and taken the benefit of it.   Their petitions to have default declared are now pending undetermined after hearing before Judges Grosscup, Anderson, and Humphrey.

In regard to the amendments seeking to bring in the alleged fraud of Mr. Yerkes in receiving $400,000 of the stock of the North Shore Company, I was at first inclined to think that the amendment should be allowed, and so announced to counsel at a former hearing.   This North Shore Company was never merged in the Consolidated, nor did its stock ever pass to the Union Company, so that the only parties interested in that question are the complainants, their receivers, the North Shore Company, and the Yerkes estate.   It appears from the first paragraph of the bills that the North and West Companies in April, 1903, duly assigned all their property to their receivers.   This cause of action is therefore vested entirely in the receivers.   They have never been requested to enforce this cause of action, which is entirely separate from the causes of action set up in the bills.   The North and West Companies simply asked the receivers to file a bill containing the allegations of the bills of complaint in these cases. This would not include a separate cause of action like the one in question.   For this reason, and because further reflection has convinced me that it will cause some inconvenience to allow this cause of action to be brought in by amendment, I have concluded to deny the first amendment asked on pages 1 to 4 of the proposed amendments.   Although it appears that the Illinois statute of limitations of one year applies to this cause of action, under the case of  Security Trust Co. v. Black River Nat. Bank, 187 U. S. 211, 23 Sup. Ct. 52, 47 L. Ed. 147, yet I think, on the whole, it should be denied.

Amendment No. 2 is allowed, Nos. 2a and 2b, relating to the delivery of the Consolidated bonds, are disallowed as presenting an immaterial issue.   Nos. 2d, 3, 4, 5, 6, and 7 are allowed, except paragraph 9b, on the last page of the proposed amendments.   All other amendments, including those suggested since the last hearing, are disallowed.   Demurrers to new matter affecting side agreement sustained.