SEMINOLE SECURITIES CO. v. SOUTHERN LIFE INS. CO.

(Circuit Court, E. D. North Carolina. October 3, 1910.)

No. 316.

1. CORPORATIONS (§ 80*)—SUBSCRIPTIONS TO STOCK—RESCISSION FOR FRAUD—ESTOPPEL.

A stockholder of a corporation brought a suit in equity on behalf of himself and all other stockholders to have the affairs of the corporation wound up, alleging that fraudulent mismanagement by its officers had rendered it insolvent. Receivers were appointed, who brought a suit in another state for the cancellation of a contract made by such officers on behalf of the corporation, which suit was compromised and settled with the approval of the court; the receivers being paid a considerable sum. Thereupon notice was sent to all stockholders to come in and prove their holdings, and from the proceeds of the settlement of the receivers' suit a dividend of 20 per cent. was paid to all stockholders. Held, that stockholders, who came in pursuant to such notice, proved their claims, and received their dividends, were estopped to afterward maintain suits to rescind their contracts of subscription for fraud and claim as creditors of the corporation the amounts paid for the stock or to attack the validity of the settlement in the proceeds of which they had shared.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 262; Dec. Dig. § 80.*]

2. CORPORATIONS (§ 682*)—INSOLVENCY AND RECEIVERS—SETTLEMENT OF SUIT BY RECEIVERS—RIGHTS OF RESIDENT CREDITORS.

Receivers for a corporation which had ceased to be a going concern brought an ancillary suit in another state, which was compromised and settled with the approval of the court, and the compromise agreement partially executed by the payment by the defendant of a large sum of money to the receivers, which was distributed by the court of primary jurisdiction among the stockholders of the corporation. Held, that local creditors of the corporation in the state of the ancillary suit who had previously made no claims, conceding their claims to be valid, had no equity at that time to have the settlement set aside to enable them to collect the same by garnishment of the defendant.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 2662; Dec. Dig. § 682.*]

3. WORDS AND PHRASES—"CLASS SUIT" — "CREDITORS' SUIT"—"STOCKHOLDERS' SUIT."

A "class suit" is one in which one or more members of a numerous class, having a common interest, sue in behalf of themselves and all oth-

er members of that class. Such suits are sometimes called "creditors' suits" and sometimes "stockholders' suits."

[Ed. Note.—For other definitions, see Words and Phrases, vol. 2, p. 1728.]

In Equity. Suit by the Seminole Securities Company, by its receivers, against the Southern Life Insurance Company. On motion to dismiss cross-bills of J. S. Carr, J. G. Patterson, and J. W. Hudgins. Motion sustained.

Grier & Park, Nelson, Nelson & Gettys, Frank Carter, and H. D Chedester, for complainants.

Guthrie & Guthrie and Bramham & Brawley, for defendants Carr and others.

Aycock & Winston, for defendant Southern Life Ins. Co.

CONNOR, District Judge. The original bill herein was filed January 18, 1909, in which it is alleged: That the Seminole Securities Company is a South Carolina corporation. That defendant is a North Carolina corporation. That on December 15, 1908, J. S. Klugh and others, stockholders in plaintiff company, instituted an action in the court of common pleas of Richland county, in the state of South Carolina, against said Seminole Securities Company, John Y. Garlington, president, and certain other defendants whose names are set forth, directors and trustees of said company, alleging certain wrongful and fraudulent conduct in the management and operation of the affairs of said company, resulting in its insolvency. A copy of the record in said cause is attached to the bill. Complainants further allege that, during the month of September, 1910, and prior to the institution of the original action in the courts of South Carolina, the officers and agents of the defendant Southern Life Insurance Company, on behalf of said company, opened negotiations with the officers of the plaintiff company for the purpose of effecting a sale of a large block of the stock of said company, to the plaintiff company. That, as a result of said negotiation, defendant company sold to plaintiff company 3,000 shares of its capital stock for the sum of $324,000, being $108 per share, which was of the par value of $50 per share, of which sum plaintiff company paid to defendant company $16,000 cash and $155,000 in certificates of deposit, notes, and securities and executed its note for the balance to which the stock so purchased was attached as collateral security. That the real value of the stock so sold to plaintiff company did not exceed the sum of $40 per share. Complainants charge that the negotiations for and purchase of said stock was a fraud upon its stockholders, participated in by its officers and the officers and agents of defendant company, setting forth fully the manner in and agencies by which the fraud was perpetrated. That by the said fraudulent conduct of its officers complainant company had been wrecked, its assets wasted and dissipated, its credit destroyed, and it was "put out of business." Complainants prayed that the contract between its officers and defendant company be canceled, that an accounting of the money, securities, etc., received by defendant com-

pany be had, restitution made, and for other relief, etc. Upon the hearing before Hon. R. C. Watts, judge of the court of common pleas, having jurisdiction in the premises, plaintiffs Frank G. Tompkins, Hugh Sinkler, and E. J. Ethridge were appointed receivers, with the usual powers conferred upon receivers, etc. Thereafter, by further orders in the cause, the other plaintiffs were appointed co-receivers. That leave had been given said receivers to bring and prosecute this suit.

On July 12, 1909, complainants filed an amendment to the bill, setting forth that, as a part, and in furtherance of, said fraudulent transaction, the officers of complainant company executed a note for $68,-000, payable to itself or to C. J. Hebert, who, it alleges, was the agent of defendant company in the negotiation and consummation of the alleged fraudulent transaction. That to said notes the stock of defendant company attempted to be purchased was attached as collateral. That said notes and stock were in the possession of said C. J. Hebert, a resident of the state of Tennessee. Complainant prayed for relief against said Hebert, etc.

Thereafter, on March 18, 1909, by an order of this court, the complainants, receivers, were appointed ancillary receivers in this state, and leave given them to become parties, in that capacity, to this suit. They qualified as such ancillary receivers by giving bond, etc. An order was made in this cause enjoining and restraining all persons from prosecuting actions against the complainant Seminole Securities Company in the state courts or otherwise than by becoming parties to this suit, etc.

On February 2, 1909, the complainant receivers and the defendant company made and entered into an agreement for settlement and compromise of the controversy between them in this suit, the terms of which were fully set forth in a paper writing signed by said receivers and by counsel representing defendant company. The terms of said settlement, so far as they are material to the questions now under consideration, are: The contract for the sale and purchase of said stock is canceled. The defendant life insurance company returns to said receivers the sum of $109,785. The sum of $30,000 is retained by defendant company. The question as to the true amount received by defendant company from the officers and agents of complainant company to be settled by reference, etc. The defendant company obligated itself to save harmless the complainant company from any loss, damage, or harm by reason of the note of $68,000, and that same be delivered up and canceled. That an action then pending in the superior court of Scotland county, N. C., by Watson and others, stockholders, against Seminole Securities Company, be dismissed by a time named. There were other provisions in said agreement not necessary to set out, all of which fully appear by reference to a copy of the agreement filed in the record herein. It was further provided that said settlement be submitted to this court for its approval, and that a decree be drawn carrying its terms into effect. On February 19, 1909, an order was made by Hon. J. C. Pritchard confirming said settlement.

J. S. Carr and J. G. Patterson and J. W. Hudgins on September 22, 1909, instituted actions in the superior court of Durham county against the complainant Seminole Securities Company and levied attachments upon its property in the hands of defendant company. An order was issued in this cause directing said parties to show cause on October 9, 1909, why they should not be enjoined from proceeding in said actions, etc. In response to said order, said parties answered and submitted themselves to the jurisdiction of this court in this cause and asked to be made parties defendant in this suit, "with leave to answer so much of the original bill and amendments thereto as they may be advised by their counsel they should answer and to file cross-bills in this suit," etc. Each of said parties filed separate answers to the rule. On said day an order was entered making said J. S. Carr, J. G. Patterson, and J. W. Hudgins parties defendant herein with leave to answer and file cross-bills, etc. Pursuant to said order, defendants J. S. Carr, J. G. Patterson, and J. W. Hudgins on November 24, 1909, filed their cross-bill in this suit, alleging that they and each of them are creditors of complainant Seminole Securities Company, and that their relation to said company as creditor arose in the following manner: J. S. Carr alleges that he is the bona fide owner of certificate No. 775 for 1,000 shares of the capital stock of the said company of the par value of $1 each issued to him on June 22, 1908; that he was induced to purchase said stock at the price of $1,500 by the false and fraudulent representations of the agent of complainant company. Said representations are fully set forth and need not be repeated here. That said Carr has received from the complainants in this suit, as receivers of said Seminole Securities Company, on, or about, June 14, 1909, the sum of $200, which he has applied as a credit on his aforesaid claim.

Defendant Patterson alleges: That, under the same circumstances, and being induced thereto by the same false and fraudulent representations of complainants' agents, he became the owner of a certificate of the capital stock of said company for 2,000 shares at the price of $3,000, which sum he paid therefor. That he received June 15, 1909, the sum of $400 from the complainants, receivers, in this suit, which he has credited on said claim, the balance of which he alleges is due him as a creditor of complainant. His allegations in regard to the manner in which he was induced to purchase the said stock are substantially the same as those of defendant J. S. Carr.

Defendant Hudgins alleges: That, under the same circumstances, being induced thereto by the same false and fraudulent representations of the complainants' agents, he became the owner of certificate of a capital stock of said company for 1,000 shares of the par value of $1 each, at the price of $1,500, which sum he paid therefor. That on, or about, June 15, 1909, he received from the complainants, receivers, in this suit, the sum of $200, which he has applied as a credit on the aforesaid claim, leaving the complainant company indebted to him for the balance thereof. The defendants join in the allegation that they are advised by counsel that, having been made parties to this suit, by order of this court, at the instance of the com-

plainants, they are parties for all purposes with leave to file their cross-bill, and they pray the court that their rights as attachment creditors be fully preserved and protected. They neither admit nor deny the allegations contained in the original bill and amendments. They demand that a full investigation be had in the premises. They allege, upon information and belief: That the full facts disclosed by the pleadings in this suit and in this cause in regard to the dealings between the complainant company and the defendant company resulting in the alleged compromise and agreement between them were purposely and fraudulently withheld and not fully disclosed to this court at the time of entering and granting the court's approval of said compromise, agreement, and adjustment. That said compromise and agreement was collusive and fraudulent as against these defendants. They are advised and believe, and so allege, that after the fraudulent dealings between said Seminole Company and defendant Southern Life Insurance Company became known to some of those who had not known it, and when the collapse of said Seminole Company took place, there was a rush and scramble among the South Carolina stockholders and creditors, with their numerous counsel, who knew full well that the block of the assets of the said Seminole Company were in the possession of the Southern Life Insurance Company at Fayetteville, N. C., and could not, therefore, be reached through legal process of the South Carolina state courts to have receivers appointed by the South Carolina state courts, and then, if possible, have this court, which is of larger jurisdiction, confirm the appointment of said receivers as ancillary receivers to this court, not with a view of administering any part of the assets of said Seminole Company through this court, but to use this court only to interpose by its injunction orders and restrain all attaching creditors residing in North Carolina and other states from bringing suit against said Seminole Company and said Southern Life Insurance Company, to the end that the funds in the hands of the said insurance company belonging to said Seminole Company might be removed to South Carolina without the jurisdiction of the North Carolina state court, there to be administered and consumed in extravagant allowances and attorney fees. The cross-bill sets out in detail and at great length the contentions of defendants in regard to the purpose of the said settlement and compromise, alleging the same to be fraudulent and collusive. The defendants in said cross-bill pray for the following affirmative relief:

First. That they be declared attachment lien creditors of the said Seminole Company and, as such, entitled to priority of payment of their respective claims.

Second. That the interlocutory decree of the court made on the 19th day of February, 1909, be set aside and declared null and void, and that the compromise and agreement of February 2, 1909, between the complainants and the Southern Life Insurance Company, upon which said decree is based, be declared fraudulent and set aside.

Third. That the true amounts independent and without reference to the pretended decree of compromise of February 2, 1909, received

by the Southern Life Insurance Company from the Seminole Company, be ascertained and determined by this court by reference, etc.

Fourth. That until this cause can be heard and final orders and decrees made complainants be ordered not to dispose of any of the assets of said Seminole Company until further order of the court, etc.

On January 1, 1910, complainants filed their answer to the cross-bill, in which they deny that the said defendants or either of them are creditors of the Seminole Securities Company as alleged. They further deny any knowledge or information as to the circumstances under which the subscriptions by said defendants to the capital stock of the Seminole Company were made, and in reference thereto allege:

That in December, 1908, the stockholders of said company met in Columbia, S. C., at which meeting defendant J. S. Carr was present. That, at said meeting, the affairs of said company were fully discussed, and the fraudulent transactions and dealings of its officers in procuring the subscription to the capital stock were fully gone into and discussed. That the stockholders at said meeting elected of their number certain directors with the view of rehabilitating the affairs of the company or, finding it impossible to do so, to liquidate its affairs. That the said J. S. Carr was elected at said meeting one of its directors for the purpose aforesaid and accepted said appointment.

That after said meeting and on the 5th day of January, 1909, Jas. A. Watson and others, claiming to be stockholders of said company, instituted an action in Scotland county, N. C., against said company and others, in which they filed a complaint setting forth the alleged fraudulent transaction between said company and defendant life insurance company and a proposed compromise and settlement between said companies. In said complaint the appointment of the new directorate of the company including J. S. Carr is set out. Plaintiffs in said action ask that the court appoint defendant J. S. Carr receiver of the funds of the Seminole Company in North Carolina and a settlement of its affairs, etc. Complainants in answer to the cross-bill further allege that in said action defendant J. S. Carr was appointed temporary receiver of the assets of said Seminole Company and qualified as such by giving bond and entering upon the discharge of his duties, resigning as director of the said Seminole Company. They further allege that, pursuant to the terms of the compromise and settlement hereinbefore set out, "the said J. S. Carr, as receiver, appeared in the court of Scotland county, N. C., with his attorneys, and pursuant to the terms of said agreement participated in the dismissal of the said suit of Watson and others against said Seminole Company and procured from the court an allowance for his services as temporary receiver and to the said counsel for their services, which said allowances were thereafter paid out of the proceeds of said compromise and settlement."

That thereafter in May, 1909, in the case of Klugh and others against said Seminole Company pending in the court of common pleas in the state of South Carolina, a call was issued to the stockholders of said Seminole Company "to come in and prove their holdings of

stock in said Seminole Company" in the said cause, and the defendant Carr did, pursuant to said call, prove his holdings of stock therein by affidavit, a copy of which is attached. It appears from said affidavit that defendant Carr claimed to be a bona fide holder of the certificate for 1,000 shares, etc. Said affidavit concludes as follows:

"Affiant desires to participate in the assets of the said Seminole Securities Company for the amount of the aforesaid claim."

That thereafter he received a dividend of 20 per cent. on the said stock, which dividend was derived directly from the aforesaid settlement with the Southern Life Insurance Company. Complainants allege, upon information and belief, that the said J. S. Carr had full knowledge at the time he so received the same that it was paid from the proceeds of the settlement of the said Southern Life Insurance Company.

Complainants, in their said answer, allege: That the defendant J. G. Patterson, on behalf of himself and other stockholders of the said Seminole Company, instituted an action in Richland county, in South Carolina, and filed a complaint against the Seminole Company and others, a copy of which is attached, in which said J. G. Patterson claimed, under oath, to be a stockholder of said Seminole Company. That thereafter the said Patterson attended a meeting of the said Seminole Company held in Columbia, S. C., and participated therein, at which meeting the affairs of said company were fully discussed and the fraudulent dealings and conduct of its officers and agents fully ventilated. That thereafter, pursuant to the call for stockholders issued by the court in the case of Klugh and others against Seminole Company, state of South Carolina, said Patterson proved his claim as a stockholder in said Seminole Company and made an affidavit that he was the owner and holder of 2,000 shares of stock in said company, copy of which affidavit is attached and in form similar to that filed by defendant J. S. Carr. That said Patterson received a dividend of 20 per cent. on his stock in said company; the same being paid to all stockholders alike. On information and belief complainants alleged that the said J. G. Patterson had full knowledge at the time that the only source from which any fund could be derived for stockholders was from the proceeds of the said settlement of the Southern Life Insurance Company.

Complainants further allege that defendant J. W. Hudgins, pursuant to the general call of stockholders issued by the court in the case of Klugh and others against the Seminole Company and others in the courts of South Carolina, proved his claim as stockholder in said Seminole Company and received a dividend of 20 per cent. on his stock as aforesaid. Complainants make a similar allegation in respect to the knowledge of the said Hudgins as to the source from which said dividend was received. Complainants further allege that, at the institution of the action and the attempted levy of the attachments by the defendants J. S. Carr and others, the entire assets of the Seminole Company in North Carolina were in the custody of this court by virtue of its prior order appointing ancillary receivers, who had duly qualified as such, and all parties were enjoined and restrained

from maintaining any suits against said Seminole Securities Company, without previous leave of the court.

Complainants, further answering, deny the allegations in the cross-bill in regard to the agreement and settlement made between the said Seminole Company and the defendant life insurance company and of the order made by this court confirming said settlements. The answer in this respect is full and complete.

Complainants further allege, upon information and belief: That defendants J. S. Carr, J. G. Patterson, and J. W. Hudgins, their solicitor, were fully advised as to the terms and objects of the said agreement and fully appreciated that it was the only way by which anything could be saved to the Seminole Company. That they participated in the dismissal of the suit of Watson and others against the Seminole Company, above referred to, for the express purpose of having the compromise consummated. Complainants in the answer to the cross-bill insist that, by reason of the matters and things set out therein, the defendants are estopped from alleging that they are creditors of said Seminole Company and from attacking the settlement made between the complainants and the Southern Life Insurance Company and pray that the said cross-bill may be dismissed.

On the 9th day of March, 1910, the defendant J. S. Carr filed a reply to the answer of the complainants to the cross-bill reiterating the allegation that he was a creditor of the said Seminole Company, and the fraudulent character of the transaction whereby said company became indebted to him as set out in his cross-bill. That, in respect to the other allegations of said answer to the cross-bill, defendant alleges that he was appointed and accepted the appointment of receiver in the case of Watson and others against the Seminole Company, in good faith and upon the solicitation of the counsel representing the Seminole Company. He attaches a copy of his report as receiver, in which he states that he has not received, and is not likely to receive, anything therefrom and asks the court to relieve him, etc. That an order was made by the court discharging him from the said receivership. He further avers that he was not a party, either as receiver or personally, to the alleged compromise and agreement between the complainants and the defendants Southern Life Insurance Company, nor has he approved the same; but, on the contrary, having incidentally learned that such an arrangement had been entered into without his knowledge or consent, whereby the assets of the Seminole Company in North Carolina were sought to be removed from said state and beyond the jurisdiction of the superior court of Scotland county, and that a receivership was being used merely to keep off creditors until the said removal of the assets could be finally accomplished, he resigned the receivership, etc.

No reply is filed by the defendants Patterson and Hudgins to the answer to the cross-bill. The cause was set down for hearing and argument upon the pleadings.

It appears from the allegation in the answer and the cross-bill, taken for the purpose of the motion to dismiss to be true, that defendants J. S. Carr, J. G. Patterson, and J. W. Hudgins on or about June 22, 1908,

were induced by the false and fraudulent representations of the accredited agents of the complainant Seminole Securities Company to subscribe and take the several certificates of stock as set forth in the cross-bill; that they paid for said stock the amount and in the manner set out, and received certificates therefor. Assuming that the representations made by the agents of complainant company were of the character which entitled the defendants, upon discovering that they were false and fraudulent, to rescind the contract of subscription and sue the company for the amount paid as for money had and received, or to file a bill in equity for rescission and accounting, it is well settled that, after discovering the fraud, they should have returned or tendered the certificate of stock and made demand for the amount paid by them and thereafter have refrained from doing any act inconsistent with their contention that they were creditors and not stockholders of said company.

It is elementary learning that, where a party has been induced to enter into a contract by such false and fraudulent representations as, upon discovery, entitles him to rescind and sue for the amount paid out by him upon such contract, he must do so within a reasonable time and must refrain from taking any benefit under his contract of subscription inconsistent with his contention that he is a creditor. Chamberlain v. Trogden, 148 N. C. 139, 61 S. E. 628, 16 Am. & Eng. Ann. Cas. 177.

"Where a stockholder, after discovery of the fraud, has elected to retain his membership and to seek to retain an adjustment of his rights as a member of the association, he cannot, after several years have elapsed, secure a cancellation of his subscription and recover back the money paid." 26 Am. & Eng. Enc. 944.

"There are obvious reasons why a shareholder of a corporation should not be released from his subscription of the capital stock after the insolvency of the company, and particularly after a proceeding has been inaugurated to liquidate its affairs. * * * If a considerable period of time has elapsed since the subscription is made, if the subscriber has actively participated in the management of the affairs of the corporation, if there has been any want of diligence on the part of the stockholder, either in discovering the alleged fraud, or in taking steps to rescind when the fraud is discovered, the right to rescind should be denied." Id.; North Chicago Street Railway Company v. Chi. Union Traction Co. (C. C.) 150 Fed. 626.

It does not appear from the cross-bill when defendants discovered that the representations made to them by the agents of the Seminole Company were false. It does appear, however, that during the month of December, 1908, at a meeting of the stockholders held in Columbia, defendants J. S. Carr and J. G. Patterson were present when the affairs of the company were fully discussed and the fraudulent conduct of its officers "fully ventilated." At this meeting defendant J. S. Carr was elected a director and accepted said position, and on the 15th day of the same month Klugh and others commenced their action in the state court of South Carolina resulting in the appointment of plaintiffs as receivers.

It further appears that, during the month of September, 1908, the negotiation between complainant company and defendant life insurance company, which resulted in the fraudulent dissipation of the as-

sets of complainant company, began. It further appears that, in the action by Watson and others against the Seminole Company, the complaint was filed January 5, 1909, in which the fraudulent conduct of the officers of said company was fully set forth; and it was in said complaint alleged that the complainants and defendant company had entered into an agreement to rescind the transaction and return to the Southern Life Insurance Company the stock, and the said company to return the notes and repay the cash received from the Seminole Company. A copy of said agreement was attached to the complaint. It is obvious from the date of the complaint that this was not the agreement finally made between the parties. The court is asked to appoint said J. S. Carr receiver, which was done on the same day. It further appears: That by one of the provisions in the agreement of February 2, 1909, the action of Watson and others, in which Mr. Carr was receiver, was to be withdrawn on or before February 20, 1909. That pursuant to said agreement said action was withdrawn. That Mr. Carr filed his report as receiver, in which he set forth that: .

"On February 20, 1909, the defendant Southern Life Insurance Company has imparled with certain receivers of the Seminole Company appointed by a court in South Carolina and upon agreement with said South Carolina receivers has paid over to said South Carolina receivers in cash something over $100,000 upon certain stipulations and agreements entered into between defendant Southern Life Insurance Company and said South Carolina receivers, the exact terms of which said stipulations and agreements the undersigned is not advised." Report of J. S. Carr, receiver, attached to reply.

In the light of this knowledge in regard to the affairs of the Semiole Company, the conduct of its officers, the action of Klugh and others in South Carolina, and of the receivers in this court, instead of repudiating the relation which he has occupied to the Seminole Company as a stockholder, returning his certificate of stock, and asserting his right to rescind the contract of subscription, and asserting his claim as a creditor, he files his claim as a stockholder in the case of Klugh and others pending in the court of common pleas in South Carolina, and receives his pro rata share, based upon his rights as a stockholder in the fund derived from the contract which he now attacks as fraudulent. This was in June, 1909. In his affidavit filed in that cause he expressly declares that he is a stockholder claiming and receiving all of the benefits to which that relation to the company entitled him. It was not until September 22, 1909, after the defendant company had, in part performance of the agreement, returned the $109,785 received from the Seminole Company and assumed other obligations based upon said agreement of February 2, 1909, that defendant J. S. Carr brought his action in the superior court of Durham county, asserting his right to rescind the subscription. Applying elementary principles of law or doctrines of equity to the conduct of the defendant, it is manifest that he cannot successfully appeal to a court. of equity as a creditor of the Seminole Company. The obviously just principle is thus stated by Mr. Justice Brown in Davis v. Wakelee, 156 U. S. 680, 689, 15 Sup. Ct. 555, 558 (39 L. Ed. 578).

"It may be laid down as a general proposition that, where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have chang-

ed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." Daniels v. Tearney, 102 U. S. 415, 26 L. Ed. 187.

As said by Sanborn, Circuit Judge, in North Chi. St. Ry. Co. v. Chi. Union Tr. Co. (C. C.) 150 Fed., at page 626:

"It seems that the rule of inconsistent positions or quasi estoppel applies, * * * and, if a person avails himself of the benefit of a transaction, he cannot be heard to deny its validity."

As to Mr. Patterson, it appears that he attended the same meeting in December, 1908, at which Mr. Carr was elected a director and at which the affairs of the company and the fraudulent conduct of its officers alleging the fraudulent representations by which he was induced to subscribe for stock and the other fraudulent conduct of said officers. This action was brought by Mr. Patterson, "in behalf of himself and other stockholders," for the purpose of having a receiver appointed and the assets preserved for the benefit of the stockholders, etc. It is not alleged that he had knowledge of the pendency of the action by Klugh and others, or of the institution of this suit or the making of the compromise agreement; but it is alleged, and not denied, that on May 19, 1909, pursuant to a call to the stockholders by the receivers in the case of Klugh and others "to come in and prove their holdings of stock in said Seminole Securities Company," he made an affidavit, a copy of which is attached to the answer, stating:

"That he was the owner and holder of 2,000 shares of the capital stock of the Seminole Securities Company as evidenced by certificate No. 1,006 hereto attached."

It is further alleged "on information and belief that the said J. G. Patterson had full knowledge at the time that the only source from which any fund could be derived for stockholders was from the proceeds of said settlement with the Southern Life Insurance Company"; that on June 15, 1909, he received from said receivers from said fund $400, his pro rata share thereof. He instituted his action in the superior court of Durham county on September 29, 1909, attacking funds of the Seminole Company in the hands of defendant company. It thus appears that Mr. Patterson knew that a fraud had been practiced upon him at least on December 16, 1908; that he brought an action against the company as a stockholder seeking to have its assets preserved and administered for himself and all other stockholders; that as late as May 10, 1909, he asserted his rights as a stockholder, and on June 15, 1909, received his pro rata share of the proceeds of the fund obtained by complainant receivers under and pursuant to the terms of the agreement of February 2, 1909. He does not deny that he knew said fund was derived from this source.

As to defendant J. W. Hudgins, it is not alleged that he had knowledge of the condition of the Seminole Company or of the actions and suits pending against it. It appears that, pursuant to the same call addressed to other stockholders, he filed an affidavit stating that he was the bona fide owner of 1,000 shares of the capital stock of said company, etc.; that on June 15, 1909, Mr. Hudgins received from said fund $200, his pro rata share as a stockholder; and "that he had full

knowledge, at the time, that the only source from which any fund could be derived for stockholders was from the proceeds of the said settlement with the Southern Life Insurance Company." He instituted his action in the superior court of Durham county September 30, 1909.

It not appearing at what time Mr. Hudgins first had knowledge of the fraud practiced upon him in procuring his subscription for stock, it may be assumed that it was not until he received notice of the call by the receivers to file his claim as a stockholder, and that he then learned that by the settlement made between the Seminole Company and the Southern Life Insurance Company the amount to be distributed had come into the hands of the receivers. Was he not called upon then and there to assert his right to rescind his subscription and rely upon his right to payment in full as a creditor? Could he share as a stockholder in the distribution of a fund thus derived, and thereafter, in another jurisdiction, seek to assert the inconsistent right of a creditor and ask the court to vacate and set aside the agreement as fraudulent? The attitude of Mr. Hudgins being the most favorable, it follows that, if he cannot maintain his contention, his codefendants have no standing in this court.

Passing the question whether, upon this aspect of the case, the defendant Hudgins could have maintained an action at law as a creditor, having elected to rescind the contract whereby he became a stockholder, at any time within three years, notwithstanding the receipt of the dividend, he is confronted with other and serious questions when he comes into a court of equity demanding equitable relief. It is clear that the suit in the court of common pleas of South Carolina was brought in behalf of Klugh and the other plaintiffs named, and "of all other stockholders," etc.; that the purpose of this action was to invoke the equitable power of the court to recover, by appropriate means, and administer as a trust fund, the assets of an insolvent corporation which had ceased to be a "going concern." The relief prayed is to that end. This is what is called in works on equity practice a "class suit," in which one or more members of a numerous class, having a common interest, may sue in behalf of themselves and all other members of the class. The jurisdiction is well settled. Such suits are sometimes called "creditors' suits," and sometimes, as in this instance "stockholders' suits." Provision is made in the federal courts for such suits by Equity Rule 48; 1 Sheet's Fed. Eq. Pr. 539 et seq.

Without discussing the extent to which members of the class are bound by the decree in such suits by representation, it is clear that when they "come in" at any time during the pendency of the suit, and before final decree, and join in the prayer for relief, or, upon a reference, prove their claims and share in the distribution of the fund brought into, or under, the control of the court, they become, in all essential respects, parties thereto and are bound by the decrees made in the cause. It is usual, when such suits are pending in the same jurisdiction, to compel all parties interested in the fund to come in, and, if separate suits have been brought, they are consolidated with the original "class suit."

When, therefore, the defendants Carr, Patterson, and Hudgins were notified by the court in the action of Klugh and others to prove their holdings as stockholders and share in the trust fund in the hands of the receivers, they were put to their election, either to do so or refuse and assert their claims to the fund, adverse to the other stockholders. They elected to come into that case, submitting themselves, as stockholders, to the jurisdiction of that court, thereby becoming parties for all purposes to that cause. It would, whether so intended or not, be trifling with the court, and doing injustice to the other stockholders, to permit them to participate in the distribution of the funds, and, after taking their share, immediately assume an antagonistic relation to the company and sue as creditors.

As is said by Mr. Justice Swayne in R. R. v. McCarthy, 96 U. S. 258, 24 L. Ed. 693:

"Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after the litigation has begun, change his ground and put his conduct upon another and different consideration. He is not permitted thus to mend his hold."

The principle is illustrated by the observation of the court in Davis v. Wakelee, supra:

"It is contrary to first principles of justice that a man should obtain an advantage over his adversary by asserting and relying upon the validity of a judgment against himself and, in a subsequent proceeding upon such judgment, claim that it was rendered without personal service upon him."

As illustrating the extent to which the courts have gone in enforcing this "first principle of justice," it was held in Kirk v. Hamilton, 102 U. S. 68, 26 L. Ed. 79, that where a void judicial sale had been made, and plaintiff, while the cause was upon a reference for a statement, as well of the trustee's accounts as for a distribution of the fund realized by the sale, appeared before the auditor, by an attorney, and made objection to the allowance of the simple contract debts, which had been proven against him in his absence, he was estopped from asserting title to the land. Mr. Justice Harlan said:

"The sale may have been a nullity, and it may be that he could have repudiated it as a valid transfer of his right of property. Instead of pursuing that course, he, with a knowledge of all the facts, appeared before the auditor and disputed the right of certain creditors to be paid out of the fund which had been raised by the sale of his property. He forbore to raise any question whatever as to the validity of the sale, and by his conduct indicated his purpose not to make any issue in reference to the proceedings in the equity suit. * * * He was silent when good faith required him to put the purchaser on guard."

I am of the opinion, upon the view of the pleadings most favorable to the defendants, that, by "proving their holdings as stockholders" in the suit of Klugh and others and receiving their dividend from the fund brought into the court by the action of the parties to this suit with the approval of the court, they became parties to that suit as stockholders and cannot now maintain the status of creditors.

I am further of the opinion that by such action they have acquiesced in the status quo and cannot maintain any position inconsistent therewith. Assuming, however, that either of these conclusions is erroneous, there is an absence of equity in their cross-bill. If they were

properly in this court, as creditors, it is manifest that it would be inequitable to the stockholders of both corporations to rescind and set aside the compromise agreement. It is an elementary doctrine of equity that an executed contract will not be rescinded, unless the parties may be restored to their original rights and position. This doctrine is especially applicable when the party seeking rescission has not been prompt and diligent in asserting his equity. Here, the Southern Life Insurance Company has repaid the amount agreed upon, $109,-785, and is endeavoring in good faith, by proceedings in this cause, to carry out its agreement to indemnify the Seminole Company from loss or harm, by reason of its outstanding note for $68,000 in the hands of Hebert. The money has been distributed, and it is beyond the power of this court to make restitution. The stockholders of the Seminole Company have, in good faith, carried out their part of the agreement.

It will be observed that the "attachment liens" sought to be enforced in this suit are of no validity, unless the agreement is vacated. It is doubtful whether, at the time the suits were instituted in the superior court of Durham, the Southern Life Insurance Company had in its possession any property or chose in action belonging to the Seminole Company, subject to attachment or garnishment. The amount due the Seminole Company, under the agreement, had been paid. The $30,000 retained by the life insurance company was not, in any sense, the property of the Seminole Company, nor was it a chose in action. The agreement quoad the money was executed. Assuming that the defendants had successfully prosecuted their actions at law in Durham superior court to judgment and undertaken to enforce their garnishment against the Southern Life Insurance Company, is it not manifest that they would, for that purpose, have "stood in the shoes" of the Seminole Company, their debtor? How could they have invoked the jurisdiction of the court to rescind the agreement and take from the Southern Life Insurance Company the $30,000 retained by it without restoring the $109,000 paid pursuant to its terms. Again, would they not have been compelled, before rescinding the agreement, to release the Southern Life Insurance Company from its obligation to indemnify the Seminole Company against loss by reason of its note in the hands of Hebert? There is no suggestion that the life insurance company is insolvent. To cancel the entire agreement, or those portions of it which are unexecuted, would be to expose the stockholders of the Seminole Company to an action by Hebert or his assignee on the note—thus depriving them of a valuable contract of indemnity.

It is not suggested that the other stockholders of the Seminole Company are not as meritorious, in respect to their status towards the company, as the defendants. There is no suggestion that they had any knowledge of, or participated in, the fraud of the agents of the Seminole Company in securing subscriptions. The pleadings indicate that all of the stockholders were victims of a fraudulent conspiracy by the "promoters" of the Seminole Company. What superior equity have the defendants over the other stockholders—and they alone are concerned—which entitles them to call upon the court to set aside a settlement by which something is saved out of the wreck and indemnity

secured against further loss? or what equity have the defendants to set aside the agreement, after participating in its fruit, and take from the Southern Life Insurance Company the amount which by agreement and approval of the court it is entitled to retain?

There is another aspect of the case fatal to defendant's contention. This suit in equity is ancillary to the principal or primary suit in the domicile of the Seminole Company. The sole purpose of this suit is to enable the receivers appointed by that court to recover the assets of the corporation in this jurisdiction to the end that they may be removed into the court of original jurisdiction wherein, by appropriate decrees, the rights of all parties may by passed upon and settled. It is true the court of ancillary jurisdiction will usually, by appropriate orders, protect specific liens of local creditors by retaining the property in its jurisdiction until they are discharged. But, as in this case, before the intervention of local creditors, or any suggestion is made that there are any such creditors, the funds brought into the control of the ancillary receivers are transferred to the court of primary jurisdiction; the courts will usually refuse to entetain suits or controversies by local creditors, but send them to the court of primary jurisdiction, when full and complete remedies may be administered. The matter is largely within the discretion of the court, and such course will be pursued as best promotes the due and orderly administration of the fund and preserves the rights of all parties interested in it. 3 Street's Fed. Eq. Prac. 2705.

While there is much allegation in the cross-bill, all of which is fully met by the answer, it is difficult to perceive any valid reason why, in any aspect of the case, the compromise agreement and the approval of the court should be disturbed. The parties appear to have acted in good faith. The condition was difficult to deal with; serious questions were presented, and the rights of innocent stockholders imperiled. At the time the compromise agreement was made, and approved by the court, there was no suggestion that defendants had, or asserted, any other rights than as stockholders. There does not appear to have been any possible reason for withholding from the court any facts which could have affected its action, nor does it appear that any such facts were withheld. It was manifestly proper that the fund recovered by the receivers under the terms of the agreement should have been carried to, and distributed by the South Carolina court, where all of the stockholders were represented.

After a careful consideration of every phase of the case presented by the pleadings, I am unable to perceive that defendants are entitled to any relief in this court.

The cross-bill will be dismissed, and the cause retained until the report of the special master appointed to ascertain what, if any, further sums the receivers are entitled to recover from defendant company, under the terms of the agreement of February 2, 1909, and such other and further orders and decrees as may be necessary to the final disposition of the cause. The cost of the cross-bill and this decree will be taxed against defendants J. S. Carr, J. G. Patterson, and J. W. Hudgins.

Let a decree be drawn accordingly.